Andrew L. MANNING, et al., Plaintiffs,

v.

THE SCHOOL BOARD OF HILLSBOR-
OUGH COUNTY, FLORIDA (formerly
Board of Public Instruction of Hillsbor-
ough County, Florida), et al., Defen-
dants.

No. 58–3554–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

Oct. 26, 1998.

Victor A. Bolden, Marianne Engelman Lado, Jacqueline A. Berrien, NAACP Legal Defense & Educational Fund, Inc., New York, NY, for Andrew L. Manning.

Warren H. Dawson, Dawson & Griffin, P.A., Tampa, FL, Victor A. Bolden, Marianne Engelman Lado, Jacqueline A. Berrien, NAACP Legal Defense & Educational Fund, Inc., New York, NY, for Shayron B. Reed, Sandra E. Reed, Nathaniel Cannon, Norman Thomas Cannon, Tyrone Cannon, Darnel Cannon, Gail Rene Myers, plaintiffs.

Thomas M. Gonzalez, Thompson, Sizemore & Gonzalez, P.A., Tampa, FL, Walter Crosby Few, Few & Ayala, P.A., Tampa, FL, for Board of Public Instruction of Hillsborough County, FL, J. Crockett Farnell, defendants.

## ORDER

KOVACHEVICH, Chief Judge.

This cause comes before the Court on the Court's Order recommitting this matter to the Magistrate Judge for a determination of whether the Hillsborough County school system has attained unitary status (Docket No. 709), the assigned Magistrate Judge's Report and Recommendation (Docket No. 809), Plaintiffs' Objections to Report and Recommendation (Docket No. 812), Brief in Support of Plaintiffs' Objections (Docket No. 813), and Defendants' Response to Plaintiffs' Objections to Report and Recommendation (Docket No. 815).[1] This action was filed on December 12, 1958.

Plaintiffs represent a class consisting of all black children who attended the public schools of Hillsborough County, and the parents and guardians of those children. The complaint alleged that Defendants, the Hillsborough County School Board (formerly Board of Public Instruction of Hillsborough County), acting under the color of state law, had operated, and continued to operate the public school system in Hillsborough County on a racially segregated basis.

The Court initially dismissed the complaint for the Plaintiffs' failure to exhaust administrative remedies; however, the dismissal was reversed and remanded by the court of appeals. *See Mannings v. Board of Public Instruction*, 277 F.2d 370, 375 (5th Cir.1960). Subsequently, the Court conducted a bench trial and on August 21, 1962, entered an order finding that Defendants were, in fact, maintaining an unlawfully segregated system of public schools. Consequently, the Court enjoined Defendants from operating a racially discriminatory school system and allowed Defendants until October 30, 1962, in which to file a comprehensive plan for the desegregation of the Hillsborough County schools.

Despite the several desegregation plans devised by Defendants, the school system remained segregated. *See Mannings v. Board of Public Instruction of Hillsborough County*, 306 F.Supp. 497 (M.D.Fla.1969). Significantly, in 1971, the United States Supreme Court issued several opinions which defined with particularity the responsibilities of school authorities and the scope of powers of federal courts in eliminating state-imposed segregation in the public school systems. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *North Carolina State Bd. of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); and *Davis v. Board of School Commissioners*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). On May 11, 1971, the Court entered an Order explaining that Hillsborough County's school system remained

---

1. This Court recommitted this matter to the assigned Magistrate Judge prior to ruling on Plaintiffs' Amended Motion to Enforce (Docket No. 753). The issues raised in said motion are subsumed by the rulings in this Order.

segregated and required Defendants to prepare and submit a comprehensive desegregation plan for the Hillsborough County school system.

In the May 11, 1971, Order, the Court explained that, despite the fact that black students comprised only 19% of the total student population, 69% of these students were attending twenty-eight (28) schools which had majority black populations. However, during this same time period, 69% of the white students attended 65 schools which were all, or at least 95% white. The Court emphasized that it had been unable to find a single instance in which Defendants had taken positive steps to end segregation at a black school and, consequently, segregation returned fortuitously. (May 11, 1971, Order at 39).

In order to remedy the constitutional violation, the Court directed Defendants to submit a comprehensive desegregation plan which was to become effective at the beginning of the 1971–1972 school year, and the Court provided Defendants with the following guidelines:

> (a) The Plan shall have as its primary objective the abolition of segregation in all schools in the county, and in particular it shall aim at desegregation of all schools in the county now having a school population at least 50% black.
>
> (b) In preparing the plan the school board shall begin with the proposition that a white-black ratio of 86%/14% in the senior high schools, and 79%/21% in the elementary schools would be the most acceptable and desirable form of desegregation.

(May 11, 1971, Order at 43–44). The May 11, 1971, Order primarily addressed Defendants' responsibility to remedy the segregative policies and practices in connection with student assignments. However, the Court also reiterated the importance of site location for new schools with regards to desegregation.

On July 2, 1971, the Court approved for implementation the comprehensive plan submitted by Defendants. ("July 2, 1971 or 1971 Order"). The plan approved by the Court provided that none of the established black schools would continue in their then existing configurations. Pursuant to the plan, physical plants that were serviceable would be converted to sixth and seventh grade centers. Those facilities which were not capable of conversion, were closed.

The 1971 desegregation plan was designed to desegregate student enrollments in grades one (1) through twelve (12); neither kindergarten nor pre-school was included.[2] All schools were assigned attendance boundaries which, when combined with the transportation of certain students, was expected to eliminate all majority black schools. The students attending the predominately black schools were assigned to various schools based on the location of their residence or the transportation of groups of these students from satellite zones.[3] As a result, black students were transported to provide racially mixed populations for grades one (1) through five (5), and eight (8) through twelve (12), whereas, white students were transported to sixth and seventh grade centers.

After the Court entered the July 2, 1971, Order, Plaintiffs filed a motion which requested that any desegregation plan adopted by the Court "include faculty desegregation and policies and general reporting provisions and that the Court retain jurisdiction." (Docket No. 243). The Court subsequently required Defendants to submit reports and retained jurisdiction, but did not grant Plaintiffs' request regarding faculty and staff assignments. Nevertheless, in a previous Order issued on August 25, 1970, the Court had directed that principals, teachers, teacher-aides, and other staff, who work directly with children at a school, be assigned so that the staff's racial composition would not reflect any intention that the school be either black or white. Teachers and other staff members were to be assigned so that the race ratio

---

2. Initially kindergartens did not exist in the public school system; therefore they were excluded by the 1971 Plan. Subsequently, kindergartens were established by the School Board and the Court entered an Order which permitted kindergarten students to attend neighborhood schools, without regard to student race ratios.

3. A "satellite zone" is an area which is not contiguous with the main attendance zone surrounding a school.

would be substantially similar to the system-wide ratio. In its July 2, 1971, Order, the Court continued these requirements, but specifically declined to require any detailed procedure with regard to faculty assignments, noting that, faculty desegregation "was accomplished at every school location in the 1970 school year;" therefore, no procedural requirements were necessary.

Also, in the July 2, 1971, Order, the Court explained that the previously ordered relief of majority-to-minority transfers, other transfer rules, and Bi–Racial Committee approval of site locations, may not be required if Defendants' plan was effectuated and accomplished. However, the Court required the continuation of each of these requirements "to be available and used as necessary." (July 2, 1971, Order at 9). In addition, the Court ordered Defendants to regularly reexamine their transportation system, all facilities, and all extracurricular activities, in order to assure that they were maintained, operated, and conducted on a nonsegregated, nondiscriminatory basis. *Id.* at 10.

In the 1971–1972 school year, the School Board had desegregated all Hillsborough County Schools, with regards to student assignment; no majority black school existed in the county. (T1 at 13).[4] Each year following implementation of the 1971 Plan, Defendants filed at least two (2) reports with the Court, copies of which were served upon opposing counsel. The first report provided enrollments by race and grade, as well as, faculty assignments, by race, at each school facility operated for grades one (1) through twelve (12) in the system. The second report enumerated proposed changes in student assignments, if any, which would become effective in the following school year. (DX 6 and 7). The reports of proposed student assignment modifications included, *inter alia*, boundary changes occasioned by overcrowding and student assignment modifications necessitated by the construction of new schools. The reports also included projections of anticipated enrollments, by race, at schools affected by the proposed changes. Joint Pre–Evidentiary Hearing Statement, (Docket No. 767),

Statement of Admitted Facts at ¶ 13 ("Stipulation").

As of October 27, 1971, there were no majority black schools among the school district's 122 schools and only one (1) school, Lee Elementary, was more than 40% black. However, during the next few years, the percentage of black students increased at several schools. For example, during the next two (2) years, Edison Elementary became 40% black, DeSoto Elementary became 39% black, and Gary Elementary became 39% black. (DX 7).

The 1974 Annual Report submitted by Defendants reflected that there were 128 public schools in Hillsborough County. The report also indicated that one (1) school, Lee Elementary, had become majority black. In addition, Cleveland, DeSoto, Edison, and Gary Elementary had black student populations which exceeded 40%. After receiving this report, the Court, *sua sponte*, directed Defendants to file a supplemental plan designed to insure that, "the requirements of the Court's previous orders insofar as they relate to Lee Elementary School will be complied with as of the beginning of the 1975–1976 school year." (January 14, 1975, Order at 1); (Stipulation at ¶ 9). In addition, the Court directed Defendants' attention to the other schools in the system which were experiencing disproportionate increases in black students. *Id.*

On March 21, 1975, the School Board submitted a supplemental plan to the Court. Defendants' plan proposed to convert Lee Elementary to a sixth grade center replacing the Meacham facility. Moreover, the plan proposed to reassign Lee's former attendance area among seven (7) different elementary schools for grades one (1) through five (5). (Stipulation at ¶ 10). On June 3, 1975, the Court ordered implementation of the supplemental plan for Lee Elementary commencing with the 1975–1976 school year. (Stipulation at ¶ 11).

The 1975 Annual Report reflected that there were no majority black schools. However, five (5) schools, out of 128, had student

4. Reference to the parties' exhibits at the unitary status hearing are denoted by the letters "PX" or "DX" followed by the exhibit number. References to the seven (7) volume transcript of the hearing are denoted by the letter "T" followed by the volume and page number.

populations which were greater than 40% black (Cleveland, Edison, Gary, Graham, and Palm River elementary schools). During the 1975–1976 school year, Cleveland became a majority black school (55%). In addition, Edison became 47% black, Gary became 47% black, and Graham became 49% black. Despite the projected student populations delineated in Defendants' supplemental plan, there was no decrease in the percentage of black students in attendance at Cleveland and Gary. (DX 7).

At least since January 14, 1975, the Court has not directed the School Board to prepare a supplemental plan or to take any action with respect to the racial composition of any of its schools. Moreover, Plaintiffs did not seek relief or enforcement of any obligation imposed by the Court until June 1994. Furthermore, Plaintiffs did not file written objections with the Court respecting the actual or projected enrollments of any schools in Hillsborough County. (Stipulation at ¶ 15). In 1980, Plaintiffs objected to the proposed closing of George Washington Junior High School and Glover Elementary; however, Plaintiffs' stated reasons were not related to the anticipated racial compositions of the affected schools.

In 1990, Plaintiffs objected, for reasons other than anticipated racial composition, to the proposed conversion of Blake seventh grade center to a high school. The Court disapproved Defendants' proposal, without prejudice to subsequent resubmission as part of a comprehensive restructuring plan. (Docket No. 419).

Since the 1977–1978 school year, Defendants have made more than 300 modifications in student assignments to relieve overcrowding, to accommodate the opening of newly constructed facilities, or for other reasons, but not specifically for the purpose of affecting the race ratio of a school. (Stipulation at ¶ 19); (DX 6); (T2 at 15). Although changes to attendance patterns have not been made specifically to address race ratios at the schools, Defendants have taken into account the effect of the change on the racial composition of the schools. (Stipulation at ¶ 22); (T1 at 15, 23).

The Bi-Racial Committee, required by the July 2, 1971, Order, has existed since the time of the Order and has reviewed proposed boundary changes, the sites of new schools, and special assignments in accordance with the Court's Order. (T1 at 18–19). The Bi-Racial Committee provides input and advice on these proposals before they come before the School Board (T1 at 19–20). However, the Bi-Racial Committee is strictly an advisory board and does not have the authority to either approve or reject boundary changes. (T1 at 19).

In addition, while making adjustments to student assignments to deal with problems of overcrowding or with new school construction, Defendants, where practicable, reassigned, or divided and partially reassigned, existing satellite zones in a manner that moved enrollments toward the system-wide race ratio. (Stipulation at ¶ 23); (T1 at 25–27); (DX 4). For instance, when the School Board constructed a new facility in an area having a small resident black student population within the contiguous zone surrounding the facility, the School Board reassigned preexisting satellite zones to increase the number of black students assigned to the new facility. (Stipulation at ¶ 24); (T1 at 26, 33).

When modifying student assignments to relieve overcrowding or in connection with the opening of a new facility, the School Board has, since the 1975–1976 school year, created non-contiguous zones or satellites in at least seven (7) instances. In most instances, students reassigned on a non-contiguous basis were being transported to their former school of assignment before the change. (Stipulation at ¶ 25). However, the School Board has never created a new non-contiguous or satellite zone solely for the purpose of altering the racial enrollment at a school, including schools which were majority black. (Stipulation ¶ 26); (T1 at 14–15).

Since 1986, Defendants have not initiated boundary changes, not otherwise being considered for reasons such as overcrowding or the opening of a newly constructed facility, for the purpose of altering the racial composition at a school, including those schools that had majority black enrollments. (Stipulation ¶ 27).

The majority to minority ("MTM") transfer program which was required by the July 2, 1971, Order has existed since the time of the Order. However, this program has not been widely publicized in the past. Notwithstanding, the School Board recently directed that the program be publicized and the school district's staff has announced the program to the entire district in recent years. (T1 at 89, 92).

In November 1989, the Hillsborough County Superintendent of Schools, Dr. Walter L. Sickles, appointed a Task Force to Modify Single Grade Centers to investigate and make recommendations for reorganizing the school system so as to establish middle schools. (Stipulation at ¶ 28). A goal to be achieved by any recommended reorganization was the retention of a desegregated school system. (Stipulation at ¶ 29). In late 1990 or early 1991, the School Board suggested to Plaintiffs' counsel that representatives of the parties and their counsel meet to consider the tentative Middle School Plan being developed by the Task Force, to determine whether a joint submission of the plan could be made to the Court. (Stipulation at ¶ 30).

In early 1991, the Assistant Superintendent, James Randall, had an initial meeting with counsel for Plaintiffs. A more extensive meeting with counsel took place on March 15, 1991, attended by counsel for the parties, Dr. Sickles, Mr. Randall, and other staff members of the district, as well as, by Plaintiffs' educational and desegregation consultant, Dr. Leonard Stevens. (Stipulation at ¶ 31). In connection with the March 15, 1991, meeting, Plaintiffs' representatives were provided with a document entitled "Proposed Cluster Plan," which described the working concept of a middle school reorganization which was being considered by the Task Force. (Stipulation at ¶ 32). After several subsequent meetings, a formal report entitled "Middle School Task Force Report 3, July 1991" ("Task Force Report") was submitted to and approved by the School Board. The Task Force Report was tendered to Plaintiffs on August 20, 1991. (Stipulation at ¶ 35).

Because the school system remained under the Court's supervision, Defendants were required to propose their Middle School Plan (also known as the "Cluster Plan") to the Court. The parties proposed an agreed order to the Court, which was approved and entered on October 24, 1991 ("Consent Order"). The Court explained that the Consent Order was the "result from the school district's comprehensive study of the educational advantages of reorganizing its grade structure to establish 'middle schools' serving grades 6–8, and that the School Board's conclusion, following that study, that implementation of the middle school grade structure is desirable." (1991 Consent Order at 1). The Task Force Report was attached to and made a part of the Consent Order. (Stipulation at ¶ 36).

The Task Force Report proposed modifications which were projected to be implemented over a seven (7) year period. The modifications included grade organization and student assignments in Hillsborough County in order to accommodate the establishment of middle schools. (1991 Consent Order at 2). Prior to implementation of the Cluster Plan, Hillsborough County public school students progressed from elementary schools, to single sixth or seventh-grade centers, which were established for desegregation purposes under the original desegregation plan, to junior high schools, and then to high schools. However, under the Middle School Plan, students would progress from kindergarten through fifth grade elementary schools, to middle schools having sixth, seventh, and eighth grades, and then to high schools. Thus, the single grade centers were to be converted to middle schools. In addition, implementation of the Middle School Plan involved creating attendance "clusters" which grouped elementary and middle schools around the high school which those students ultimately would attend. (Task Force Report at 10).

The Middle School Plan also involved the creation of magnet programs at some schools. (Task Force Report at 17–25). One of the purposes of developing the magnet programs was to help desegregate the schools. Some of the schools which were targeted for the programs were predominately black prior to 1971 and the School Board anticipated that these schools would become "black schools" again if the student

population was comprised solely of students from the surrounding neighborhoods as a result of the Middle School Plan. (T1 at 66). The programs were designed to perpetuate racial balance. (T1 at 66–67).

In the 1991 Consent Order, the Court explained that:

> The Court recognizes and anticipates that there will be modifications each year of the projected student assignment patterns contained in Appendix 1 to the Task Force Report to take account of demographic or other changes that occur. In making such modifications, the school district should seek to minimize (to the extent practicable) the number of schools which deviate from the system-wide student enrollment ratios (see Task Force Report, at p. 14).

(1991 Consent Order at 5–6). However, in the Task Force Report, the School Board predicted that, under the Middle School Plan, there would be an increase, from thirty-six (36) to forty-six (46), in the number of schools that deviated from the 20/80 ratio by 10% or higher, and, an increase, from fifty-six (56) to seventy-two (72), in the number of schools that deviated from the 20/80 ratio 5% or less. Therefore, while the Middle School Plan was projected to increase the number of schools which had racial compositions closer to the district-wide ratio, the plan contemplated an increase in the number of schools that significantly varied from the 20/80 ratio.

The 1993 Annual Report reflects that the school system was comprised of 151 schools. As of the time of the report, there were eight (8) elementary schools and one (1) junior high school with student populations which were 50% or more black. Notably, Cleveland Elementary was 59% black and Robles Elementary was 90% black. In addition, there were five (5) elementary schools and two (2) junior high schools with student populations which were more than 40% black. (DX 7).

At the time of the 1996 hearing before the assigned Magistrate Judge, the Middle School Plan was in its sixth year and eleven (11) out of the seventeen (17) clusters had been implemented. The remaining six (6) clusters were targeted for the 1997–1998 school year. (Stipulation at ¶ 37). Also, during this time period, the school system had nine (9) schools with magnet programs and had plans for five (5) additional magnet programs at other schools.

On June 1, 1994, Plaintiffs filed an Amended Motion to Enforce and Consent Order (Docket No. 439). In their Motion, Plaintiffs complained, for the first time, of the existence of schools where black students constituted at least 40% of the total student population. Plaintiffs alleged that the existence of these schools was a violation of the 1971 desegregation plan adopted by the Court. Plaintiffs also asserted that Defendants had not complied with the 1991 Consent Order, which provided that, in the event Defendants deviated from the student attendance patterns contained in the proposed Middle School Plan, they would "seek to minimize (to the extent practicable) the number of schools which deviate from the system-wide student enrollment ratios." See (1991 Consent Order at 6) (citation omitted).

Plaintiffs' Motion pointed out that sixteen (16) schools, out of 149, had black student populations comprising 40% or more of the total student population. The sixteen (16) schools and the percentages of black students in each school, as of the 1995–1996 school year, was as follows: Robles Elementary (90%), Edison Elementary (75%), Sulphur Springs Elementary (74%), Oak Park Elementary (70%), Graham Elementary (67%), Foster Elementary (61%), Cleveland Elementary (57%), Shaw Elementary (56%), Witter Elementary (54%), Cahoon Elementary (52%), Clair Mel Elementary (49%), West Tampa Elementary (47%), DeSoto Elementary (43%), Van Buren Junior High (53%), Sligh Junior High (50%), and Dowdell Junior High (49%). (DX 7). Each of these sixteen (16) schools were predominately white in 1971. (T1 at 33).

Plaintiffs' Motion to Enforce was referred to the Magistrate Judge for a Report and Recommendation. The assigned Magistrate Judge held an evidentiary hearing and recommended denial of Plaintiffs' Motion for failure to establish a violation of the Court's orders. On November 17, 1995, this Court deferred ruling on the Report and Recommendation, noting that Plaintiffs' Motion focused on student assignment. The Court explained that the issues raised in connection

with Plaintiffs' Motion to Enforce, "demonstrates the need to expand the scope of the inquiry to a full fledged determination of whether the Hillsborough County school system has in fact achieved unitary status." (Order Recommitting Matter to Magistrate, Docket No. 709 at 3). The Court further emphasized that, "[a]s it stands now, this Court and the parties are attempting to chart a course for the future without the benefit of a sound assessment of where we are currently." *Id.* at 3.

Consequently, the Court ordered:

[A] showing by Defendants as to whether they have complied with this Court's 1971 Order regarding the factors set forth by the United States Supreme Court in *Green v. County School Bd. of New Kent County, Va.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In addition to student assignments, *Green* and *Freeman* require that faculty and staff assignments, transportation, extracurricular activities, facilities and resource allocation all be free from racial discrimination. In each of these areas, the School Board bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior constitutional violation of plaintiffs' rights. *Freeman,* 503 U.S. at 494[, 112 S.Ct. 1430]. The quality of education being received by all students and the good faith commitment by the School Board must be shown.

*Id.* at 4.

Following the referral Order, the assigned Magistrate Judge set a hearing on the unitary status determination and thereafter, conducted monthly status conferences with counsel for the parties. The parties exchanged discovery and retained expert witnesses. After the evidentiary hearing was concluded, the parties filed proposed findings of fact and conclusions of law which were supplemented after the filing of the 6th Annual Report to the Consent Order. Closing arguments were presented on May 22, 1997.

On August 26, 1997, the assigned Magistrate Judge issued a Report and Recommendation on the issue of whether the public school system of Hillsborough County has attained unitary status and should be released from court supervision. (Docket No. 809). After a comprehensive analysis of the issue, the assigned Magistrate Judge recommended that this Court find that Defendants have demonstrated that the public school system has attained unitary status. Although this Court agrees with a majority of the Magistrate Judge's analysis, the Court disagrees that school system should be released from supervision at this time.

█ As a preliminary matter, the Court feels compelled to address the concerns regarding the duration of this litigation and the passage of time since this Court provided Defendants with specific instructions. One theme which Defendants have reiterated continuously throughout this litigation has been that, even when the schools in the county began to deviate from the system-wide race ratios, Plaintiffs, and the Court, failed to challenge this occurrence. However, it is clear that Defendants have been charged with the affirmative duty to desegregate the public schools in Hillsborough County to the maximum extent practicable. Regardless of the reasons for inaction by Plaintiffs and the Court, Defendants remain obligated to fully and diligently discharge their duties. Although Defendants were entitled to seek release from the Court's supervision at anytime after the desegregation plan was implemented, their obligations remain until this Court ruled otherwise.

A considerable amount of time has passed since the desegregation plan was implemented. Undoubtedly, Defendants' desegregation efforts demonstrate significant success; however, the amount of time Defendants have had to achieve this success detracts from their achievements. Moreover, while Defendants may have seen the delay in the instant rulings as merely an unfortunate reality of an overcrowded Court docket, the Court has viewed this delay as an additional opportunity for Defendants to demonstrate that Court supervision is no longer necessary. Defendants have failed to capture that opportunity.

### DISCUSSION

#### Vacation or Modification

█ Plaintiffs' first objection concerns the Magistrate Judge's finding that attainment of unitary status constitutes a "changed circum-

stance" warranting vacation of the 1991 Consent Order. The Magistrate Judge explained that modification of a consent order in a desegregation case may be considered when:

(1) a significant change in facts or law warrants change and the proposed modification is suitably tailored to the change; (2) significant time has passed and the objectives of the original agreement have not been met; (3) continuance is not longer warranted; and/or (4) continuance would be inequitable and each side has legitimate interests to be considered.

(R & R at 64)(citing *Jacksonville Branch NAACP v. Duval County Sch. Bd.*, 978 F.2d 1574, 1578 (11th Cir.1992)). Plaintiffs contend that attainment of unitary status cannot amount to a changed circumstance warranting modification or vacation of a consent order. Plaintiffs argue that, in order to disturb a consent order, the change in circumstances must not have been foreseen at the time the agreement was reached. Plaintiffs cite *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), for the proposition that a significant change in factual conditions cannot be predicated on events actually anticipated at the time of entering of the decree. (Br. in Supp. of Pls.' Obj. to R & R at 12). Plaintiffs argue that, "[t]here is no evidence—nor could defendants present any plausible evidence— that unitary status was an unforeseen circumstance when the parties entered into the 1991 Consent Order." *Id.* (emphasis omitted).

Significantly, the respondents in *Rufo* argued that modification of a consent decree should only be allowed when a change in facts is both unforeseen and unforeseeable. 502 U.S. at 385, 112 S.Ct. 748. The Supreme Court explained that this standard proposed by the respondents would be even less flexible than the *Swift* test,[5] a test rejected by the Supreme Court as being too rigid to apply in all cases. *Id.* at 380, 385, 112 S.Ct. 748. Consequently, in the case at hand, Plaintiffs are proposing an unsupportable

standard. Moreover, Defendants argue that, if the attainment of unitary status cannot serve as a sufficient change in circumstances to warrant dissolution of a consent decree, then no consent decree entered in a desegregation case could ever be dissolved, despite the achievement of the stated goals. Clearly, the consent order was not intended to require judicial supervision indefinitely.

Furthermore, the *Rufo* Court acknowledged a district court's need to be able to modify a decree in desegregation cases; "[b]ecause such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased." 502 U.S. at 380, 112 S.Ct. 748 (noting the upsurge in institutional reform litigation since *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)). Moreover, "federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *See Board of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 247, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). Accordingly, if the purposes of this desegregation litigation, as incorporated in the 1991 Consent Order, have been fully achieved, then the Order can be modified and/or vacated. *Id.* In the instant case, modification is appropriate.

### Interrelated *Green* Factors

Plaintiffs also argue that the Magistrate Judge failed to address the relationships among the many *Green* factors in determining that the school system is unitary. Plaintiffs contend that the grade restructuring plan being implemented, pursuant to the 1991 Consent Order, is a seven-year plan that should be completed in order to fully evaluate its effectiveness and constitutional compliance. Consequently, Plaintiffs assert modification is inappropriate at this time. (Br. in Supp. of Pls.' Obj. to R & R at 5). Plaintiffs argue that many of the *Green* factors are inextricably linked to the grade re-

---

**5.** The *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), "standard," requiring "[n]othing less than a clear showing of grievous wrong evoked by new and unforseen conditions," has been limited to the particular facts in that case. The *Rufo* Court explained that, while the statement appears to be a harden-

ing of the traditional flexible standard for modification of consent decrees when taken out of context, "the 'grievous wrong' language of Swift was not intended to take on a talismanic quality, warding off virtually all efforts to modify consent decrees." 502 U.S. at 379–380, 112 S.Ct. 748.

structuring plan; therefore, the evaluation of the *Green* factors will depend on the full implementation of the plan and declaration of unitary status should be deferred.

Conversely, Defendants contend that continuation of the 1991 Consent Order is no longer warranted when the school system attains unitary status. Defendants argue that, if the school system is unitary, then the purpose of both the 1971 Order and 1991 Consent Order has been met; therefore, continuing supervision is unnecessary. (Def.'s Resp. to Pls.' Objs. to R & R at 3).

■■■ The Court must evaluate the *Green* factors in order to determine whether Defendants have attained unitary status. The interdependence of these factors is typically evaluated when an incremental release of Court supervision is contemplated. Contrary to Plaintiffs' assertion, the Magistrate Judge noted:

> However, if the Court has concerns about whether defendants have desegregated the elementary schools to the maximum extent practicable, continued supervision over student assignment could be retained while relinquishing jurisdiction over the other aspects of school operation as long as remedial action in the other areas is not necessary to achieve unitary status in the area of school assignment.

(R & R at 88 n.56). Consequently, the Court will analyze the relationships among the *Green* factors at the appropriate time.

### *Unitary Status*

#### I. *Vestiges of Past Discrimination*

■■■ Clearly, the attainment of unitary status is the goal of the instant desegregation litigation.[6] "The objective today remains to eliminate from public schools all vestiges of state-imposed segregation." *Swann*, 402 U.S. at 15, 91 S.Ct. 1267.

> The concept of unitariness has been a helpful one in defining the scope of the district courts' authority, for it conveys the central idea that a school district that was once a

dual system must be examined in all of its facets, both when a remedy is ordered and in the later phases of desegregation when the question is whether the district courts' remedial control ought to be modified, lessened, or withdrawn.

*Freeman v. Pitts,* 503 U.S. 467, 486, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

#### A. *Defendants' Duty*

■■■ The question is whether Defendants have successfully discharged the duty imposed by the Constitution to eliminate the vestiges of *de jure* segregation. District courts have been directed to assert jurisdiction over school systems which previously practiced *de jure* segregation to ensure compliance with the constitutional mandate of *Brown v. Board of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("*Brown I*"). *See Brown v. Board of Educ.,* 349 U.S. 294, 300–01, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("*Brown II*"). The courts' jurisdiction is to be exercised until a determination can be made that the vestiges of past discrimination have been eliminated to the maximum extent practicable. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In order to achieve constitutional compliance, a school district is obligated to comply, in good faith, with the court's desegregation decree and "take whatever [affirmative] steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. School Bd. of New Kent County,* 391 U.S. 430, 437–39, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Significantly, "[e]ach instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 459, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). Consequently, Defendants should be released from judicial supervision only when the Court finds that: (1) Defendants have eliminated the vestiges of past discrimination

---

**6.** In *Board of Educ. of Oklahoma City Pub. Schools, Independent School Dist. No. 89 v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), the Supreme Court expressed concerns for the inconsistent usage of the term "unitary." *Id.* at 245, 111 S.Ct. 630. The term

"unitary" in this Order will be used to identify a school district that has completely remedied all vestiges of past discrimination and has met the mandate of *Brown v. Board of Educ.,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). *Id.*

to the maximum extent practicable; and (2) Defendants have exhibited a record of full and satisfactory compliance with the Court's orders. Importantly, Defendants remain subject to the 1971 desegregation Order until this Court declares that the school district has achieved unitary status and has complied with the Court's orders in good faith. *See Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 439–40, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).

The School Board's responsibility to eliminate the vestiges of the unconstitutional *de jure* system "is required in order to ensure that the principal wrong of the de jure system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present." *Freeman v. Pitts,* 503 U.S. 467, 485, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). However, "a remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Id.* at 489, 112 S.Ct. 1430; *Swann,* 402 U.S. at 16, 91 S.Ct. 1267 (explaining that judicial powers may be exercised only on the basis of a constitutional violation). The purpose of the remedial action is to eliminate the vestiges of state-compelled dual systems, not to remedy racial imbalances unrelated to *de jure* segregation. *Id.* at 494, 112 S.Ct. 1430. Nevertheless, if Defendants have not discharged their affirmative constitutional duty to dismantle the dual school system, the school district remains in violation of the Fourteenth Amendment.

### (i) *Racially Identifiable*

In terms of describing the alleged shortcomings of Defendants' desegregation efforts, Plaintiffs assert that Defendants do not have a working definition of a desegregated school. The concept of "racial identifiability" is generally used to describe the relationship between the racial composition of a particular school and the racial composition of the system as a whole. The Supreme Court's decision in *Green* requires school boards to prove that racially identifiable schools are not the consequence of past or present discriminatory state action. Throughout this litigation, the parties have been unable to agree on a definition of a racially identifiable school. Nevertheless, Plaintiffs suggest a definition of a racially identifiable school as: a school having a population of black students of forty-percent (40%) or more.

Defendants argue that a working definition of a desegregated school is not required in order to determine whether unitary status has been achieved. Defendants emphasize that the Court provided numerical goals for the Defendants to consider as it aimed at desegregating schools. However, a particular percentage has not been used as a line of demarcation. For example, in the 1971 Order, the Court directed Defendants to concentrate on all schools in the county having at least a 50% black population. The Court further suggested that a white-black ratio of 86%/14% in the senior high schools, 80%/20% in the junior high schools, and 79%/21% in the elementary schools would be the most acceptable and desirable form of desegregation. 1971 Order at 43–44. Notwithstanding, Defendants stress that none of the Court's Orders have expressly or implicitly directed Defendants to maintain a particular student race ratio at any school, or to take any action in response to increased black enrollments in the schools.[7]

In the 1971 Order, the Court explained that the Hillsborough County school system was a segregated system. "As of October 24, 1969, 74% of the county's white students were in 70 white schools, whereas 65% of the black students were concentrated in 21 black schools." (1971 Order at 35). Moreover, the Court explained that, as of October 23, 1970, 46% of the school system's blacks were attending 15 black schools. "Although they comprised only 19% of the student population, 13,606, or 69%, were in 28 schools at

---

**7.** Defendants' position is not entirely accurate. As discussed above, in 1974, the Court directed Defendants' attention to the schools with increasing black enrollments and ordered Defendants to submit a supplemental desegregation plan. Moreover, the 1991 Consent Order provided that any "modifications" in student assignment pat-

terns resulting from demographic or other changes must be made with an eye towards minimizing, to the extent practicable, the number of schools which deviate from the system-wide student enrollment ratios. *See* (1991 Consent Order at 6).

least 50% black. On the other hand, 69% of the white students—57,869 out of 83,474—attended 65 schools either all white or at least 95% white." *Id.*

After the Court entered the 1971 Order, 97% of Hillsborough County elementary school students attended racially balanced schools, according to Plaintiffs.[8] In comparison, Plaintiffs argue, only 69% of Hillsborough County elementary school students attended racially balanced schools in 1995. Moreover, Plaintiffs point out that, for all but two (2) years between 1971 and 1988, 90% of junior high school students attended racially balanced schools; however, as of 1995, the percentage has dropped to 75%.[9]

▬ The Constitution does not require that every school in every community must always reflect the racial composition of the school system as a whole. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The Courts have consistently warned against the application of an inflexible standard of having "no majority of any minority" in a school.

> Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

*Id.* at 31–32, 91 S.Ct. 1267. Accordingly, it is clear that Defendants had no continuing duty to maintain a particular black to white student ratio on a school-by-school basis over the expansive time period of this litigation, including the 80%/20% ideal set forth in the 1971 Order. *See Id.* at 24, 91 S.Ct. 1267 (disapproving an approach to desegregate schools which requires, as a matter of constitutional right, any particular degree of racial balance or mixing).

▬ Nevertheless, the district-wide ratios are an important starting point to analyze Defendants' fulfillment of its obligations. "In most cases where the issue is the degree of compliance with a school desegregation decree, a critical beginning point is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole." *Freeman*, 503 U.S. at 474, 112 S.Ct. 1430. Moreover, although schools which have become virtually all one-race "require close scrutiny," they are not *per se* unconstitutional. *Swann*, 402 U.S. at 26, 91 S.Ct. 1267. However, their existence in a school system with a history of *de jure* segregation, establishes a presumption that they exist as a result of discrimination and the burden of proof shifts to the School Board. *Id.* "The school district bears the burden of showing that any current [racial] imbalance is not traceable, in a proximate way, to the prior violation." *Freeman*, 503 U.S. at 494, 112 S.Ct. 1430.

▬ The Court finds that Plaintiffs' definition of a racially identifiable school is useful and fair. A school that has 20% more black students than that of the district-wide composition indicates that the school has deviated significantly from the system-wide norm. While the phrase "racially identifiable" is useful as a descriptive term, it should not be accorded more weight than it deserves.[10] A school system can have racially identifiable schools and still be a unitary school system. Moreover, if the racial identifiability is unrelated to *de jure* segregation, a court imposed remedy is not justified. However, the fact

---

8. Plaintiffs have used Dr. Shelley's definition of "racially unbalanced" schools, which includes schools with an African–American population 40% or above.

9. Although Plaintiffs' statistics are significant, it should be noted that the October 1969, figures reflect the percentages of *white* and *black* students, whereas, Plaintiffs' figures represent the entire student population.

10. The Court will use the phrases "racially identifiable" and "racially imbalanced" or "racially unbalanced" interchangeably to generically represent schools which are a source of concern.

that a school deviates from the system-wide ratio should, at least, cause some concern and an evaluation by the School Board (the authority charged with the responsibility to desegregate the schools to the maximum extent possible), must ensue.[11] In other words, while racial identifiability of a school is relevant, it does not define the standard for determining whether the School Board has discharged its affirmative duty or has achieved unitary status.

(ii) *Demographics*

Plaintiffs challenge the Magistrate Judge's evaluation of Defendants' evidence concerning the change in demographics in Hillsborough County. Plaintiffs argue that, not only is the change in demographics in Hillsborough County far less dramatic and more incremental than in *Freeman,* but the identification of pure demographic change is further complicated by the implementation of a Middle School Plan.[12] (Br. in Supp. of Pls.' Obj. to R & R at 15). Plaintiffs maintain that the Middle School Plan requires considerable change and that the statistical information on the precise demographic effect will not be discernible until the 2000 census is available. Moreover, Plaintiffs argue that Defendants have acted, or failed to act, in a number of ways which has contributed to the racial identifiability of the Hillsborough County schools. Plaintiffs assert that the issue is whether Defendants bear any responsibility for the racial identifiability and, if so, the extent to which Defendants are responsible.

As noted above, there are sixteen (16) schools which have become focal points for determining whether or not the school system is unitary.[13] The percentages of black students in each of these sixteen (16) schools, as of the 1972–73 school year, were as follows: Robles Elementary (24%), Edison Elementary (36%), Sulphur Springs Elementary (19%), Oak Park Elementary (23%), Graham Elementary (35%), Foster Elementary (21%), Cleveland Elementary (26%), Shaw Elementary (15%), Witter Elementary (18%), Cahoon Elementary (21%), Clair Mel Elementary (18%), West Tampa Elementary (14%), DeSoto Elementary (35%), Van Buren Junior High (17%), Sligh Junior High (20%), and Dowdell Junior High (14%). (DX 7). In 1970, the total population in Hillsborough County was 490,265, of which, 422,119 were white and 66,648 (13.5%) were black. (DX 2 Table 1). During the same year, the total population between the ages of 0 to 17 years old was 164,278, of which, 135,344 were white, and 28,527 (17.4%) were black.[14] *Id.*

However, the latest figures used in this litigation reflect the following percentages of black students attending the sixteen (16) schools, as of the 1995–1996 school year: Robles Elementary (90%), Edison Elementary (75%), Sulphur Springs Elementary (74%), Oak Park Elementary (70%), Graham Elementary (67%), Foster Elementary (61%), Cleveland Elementary (57%), Shaw Elementary (56%), Witter Elementary (54%), Cahoon Elementary (52%), Clair Mel Elementary (49%), West Tampa Elementary (47%), DeSoto Elementary (43%), Van Buren Junior High (53%), Sligh Junior High (50%), and Dowdell Junior High (49%). (DX 7). In 1990, the total population in Hillsborough County was 834,054, of which, 690,352 were white and 110,283 (13.2%) were black. (DX 2 Table 1). During the same year, the total population between the ages of 0 to 17 years old was 202,274, of which, 152,900 were white, and 39,163 (19.4%) were black.[15] *Id.*

---

11. The Supreme Court has emphasized that, "the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools." *Swann,* 402 U.S. at 26, 91 S.Ct. 1267.

12. In *Freeman,* the subject school system had 5.6% black students in 1969 and 47% black students by 1986. 503 U.S. at 475, 112 S.Ct. 1430. In the case at hand, the increase in black stu-

dents ages 0 to 17 has only been from 17.4% in 1970, to 19.4% in 1990.

13. The 16 schools represent the degree of racial imbalance in the school district, i.e., approximately 10% of the schools are racially identifiable. Notwithstanding, there are additional schools which are a source of concern, as discussed below.

14. Less than 1% were classified as nonwhites.

15. Approximately 5% of the "school-age" population was classified as nonwhites.

Plaintiffs assert that, since 1971, there has been relatively little change in the racial composition of the Hillsborough County School District as a whole and by grade level, except at the high school level. (Pls. Proposed Findings of Fact and Conclusions of Law at 12). Plaintiffs contend that, while most schools in Hillsborough County reflect the district-wide student racial composition, the schools with 40% or more black student populations should be considered racially identifiable because they are approximately 20 percentage points above the system-wide ratio. *Id.* Moreover, Plaintiffs point out that, the majority of these schools are 30 percentage points or more above the district-wide black student racial composition. *Id.*

Conversely, Defendants argue that the increase in the number of schools with a majority black student population is the result of residential patterns and not the product of discrimination by the School Board. Moreover, Defendants argue that Plaintiffs' insistence on the elimination of racially identifiable schools seeks to impose an obligation on Defendants which is not mandated by governing law. Defendants emphasize that the Court may only order the elimination of racially imbalanced schools when the racial imbalance was caused by an unlawful *de jure* policy of the school district.

Defendants' recitation of the law is correct. "Racial balance is not to be achieved for its own sake." *Freeman,* 503 U.S. at 494, 112 S.Ct. 1430. In *Freeman,* Supreme Court evaluated a district court's role in supervising a school system where demographics are the cause of racial imbalances and stated:

> Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of

school districts simply because they were once de jure segregated.

*Freeman,* 503 U.S. at 495, 112 S.Ct. 1430. Accordingly, in the case at hand, the issue is whether the racial imbalances in the school district have a causal link to the *de jure* violation being remedied.

 The Court is not convinced that a shift in demographics and residential patterns explains the racial imbalance in the Hillsborough County School system. Defendants have failed to adequately discharge their affirmative duty to eliminate the dual system "root and branch." While the Court finds that the racial imbalances in the schools are not the result of a deliberate attempt by Defendants to fix or alter demographic patterns to affect the racial composition of the schools, Defendants' apathy over the years demonstrates a lack of good faith compliance.[16] Moreover, because Defendants failed to fully discharge their affirmative duty to desegregate the school system, the district has not been desegregated to the maximum extent practicable. Defendants have failed to prove that the racial imbalances are not traceable, in a proximate way, to the past *de jure* segregation.

## B. Student Assignments

All of the schools in Hillsborough County were desegregated as of the 1971–1972 school year. Furthermore, each of the sixteen (16) schools, which are currently considered racially imbalanced, was predominately white following the 1971 desegregation Order. (T1 at 33). Since that time, the School Board has implemented numerous attendance changes which altered the racial composition of the schools district-wide. However, these sixteen (16) schools have increased their black student populations relatively quickly after the 1972–1973 school year and their enrollments have become disproportionate to the system-wide race ratios. Although

16. After Defendants filed their 1974 Annual Report, which indicated that four (4) schools had become 40% black and one (1) school had become 50% black, the Court directed Defendants to file a supplemental plan designed to insure that "the requirements of the Court's previous orders insofar as they relate to Lee Elementary School[, which had become 50% black,] will be complied with as of the beginning of the 1975–76 school year." Order of January 14, 1975. In the same order, the Court directed the Defendants' attention to the other schools which had become 40% black. *Id.* Notably, this Court was expressing its concerns to Defendants only three (3) school years after implementation of the desegregation plan.

Defendants used projected attendance figures to calculate the expected improvements to the race ratios of the schools, the Court will focus on the actual changes to evaluate the cause of the racial imbalance in the sixteen (16) schools.

### (i) *Attendance Zone Adjustments*

#### *Robles Elementary*

The first boundary changes made to Robles' attendance zone took place during the 1976–1977 school year. The boundary change which affected first through fifth graders included transferring fifty-three (53) black and seventeen (17) white students from Robles Elementary to Browards Elementary. In addition, eight (8) black and three (3) white sixth graders were transferred to Potter Elementary. The actual racial composition of students in attendance for the 1975–1976 school year was 33% black and 67% white, whereas after the change was made, the actual racial composition of students in attendance for the 1976–1977 school year was 30% black and 70% white. Significantly, no other boundary changes were implemented that would have affected Robles' attendance zone. The actual racial composition of Robles for the 1995–1996 school year was 90% black and 10% white.

#### *Cleveland Elementary*

Defendants changed Cleveland's attendance area for the 1972–1973 school year to encompass a portion of Potter Elementary's attendance zone and the parameters of the attendance area were redrawn. The actual composition of students in attendance for the 1972–1973 school year was 26% black and 74% white. For the 1975–1976 school year, Defendants made boundary changes which affected first through fifth graders by adjusting the parameters of the attendance zone. All sixth grade students were moved to the Potter attendance zone. The actual racial composition of students in attendance for the 1974–1975 school year was 46% black and 54% white, whereas after the changes were made, the actual racial composition of students in attendance for the 1975–1976 school year was 44% black and 56% white. For the 1989–1990 school year, 12 black and 12 white students were reassigned from Sulphur Springs Elementary to Cleveland and the parameters of Cleveland's attendance zone were readjusted. The actual racial composition of students in attendance for the 1988–1989 school year was 61% black and 39% white, whereas after the changes were made, the actual racial composition of students in attendance for the 1989–1990 school year was 53% black and 47% white. No other boundary changes were implemented that would have affected Cleveland's attendance zone. The actual racial composition of Cleveland for the 1995–1996 school year was 57% black and 43% white.

#### *Edison Elementary*

The actual racial composition of students in attendance for the 1972–1973 school year was 36% black and 64% white. The first boundary change affecting Edison's attendance zone was implemented for the 1982–1983 school year. Twenty-one (21) white and ninety-four (94) black students were transferred from Edison to Claywell Elementary. The actual racial composition of students in attendance for the 1981–1982 school year was 55% black and 45% white, whereas after the change was made, the actual racial composition of students in attendance for the 1982–1983 school year was 50% black and 50% white. No other boundary changes were implemented that would have affected Edison's attendance zone. The actual racial composition of the students in attendance for the 1995–1996 school year was 75% black and 25% white.

#### *Graham Elementary*

The actual racial composition of the students in attendance for the 1972–1973 school year was 35% black and 65% white. The first boundary change affecting Graham's attendance zone was implemented for the 1988–1989 school year. Graham received thirteen (13) black first through sixth graders from the Gorrie satellite, pursuant to a student assignment change. The actual racial composition of students in attendance for the 1987–1988 school year was 63% black and 37% white, whereas after the change was made, the actual racial composition of the students in attendance for the 1988–1989 school year was 64% black and 36% white. No other boundary changes were implemented that would have affected Graham's attend-

ance zone. The actual racial composition of the students in attendance for the 1995–1996 school year was 67% black and 33% white.

*Oak Park Elementary*

The actual racial composition of the students in attendance for the 1972–1973 school year was 23% black and 77% white. The first boundary change affecting Oak Park's attendance zone was implemented for the 1979–1980 school year. During the 1979–1980 school year, there was a satellite transfer made from Oak Park to DeSoto Elementary and there was a satellite transfer from Gary to Oak Park Elementary. These satellite transfers were implemented in order to close Gary Elementary. The actual racial composition of students in attendance for the 1978–1979 school year was 46% black and 54% white, whereas after the change was made, the actual racial composition of the students in attendance for the 1979–1980 school year was 41% black and 59% white. During the 1996–1997 school year, one (1) white and ten (10) black first through fifth graders were transferred from Oak Park to Alafia Elementary School as the result of a needed cluster adjustment. The actual racial composition of the students in attendance for the 1996–1997 school year was not available when Defendants submitted their materials. The actual racial composition of the students in attendance for the 1995–1996 school year was 70% black and 30% white.

Defendants do not dispute the fact that no boundary changes were specifically made to reduce the racial imbalance. Instead, Defendants attribute the increase in the black student populations at the sixteen (16) schools to demographic changes in attendance zones and contend that, as a result, no changes were required. For example, Defendants argue that the percentage of black school-age children living in the Robles attendance zone increased from 13% in 1970 to 31.3% in 1980.[17] Defendants argue that the Robles attendance zone subsequently experienced a drastic increase in the percentage of black school-age children from 31.3% in 1980 to 71.4% in 1990. Census data is unavailable for changes occurring after 1990. Notwithstanding, Defendants assert that when they have made changes to the attendance patterns for reasons other than race, the racial composition of the schools was a paramount consideration.

Conversely, Plaintiffs maintain that there has been relatively little change in the racial composition of the Hillsborough County school district as a whole since 1971. Plaintiffs argue that during the period when the number of racially identifiable schools increased, Defendants opened and closed schools which created new attendance zones. Plaintiffs contend that, when the initial decisions were made, for example, to construct a new school, the principal concern should have been desegregation; the problems of overcrowding could have been adjusted accordingly. Plaintiffs argue that Defendants' obligations include, *inter alia*, considering the construction and abandonment of school facilities, and drawing attendance zones so as to affirmatively promote desegregation of the school system. Plaintiffs argue that mere neutrality is not an option.

In addition, Plaintiffs assert that over the course of this litigation, Defendants altered existing attendance zones and redeployed inner-city satellite zones from school to school. Consequently, Plaintiffs argue, Defendants were provided with an opportunity to address existing racial identifiability in the school system; however, Defendants failed to take advantage of those opportunities. Furthermore, Plaintiffs emphasize that the attendance zones were changed infrequently for the schools which are now racially identifiable; therefore, Defendants' failure to act has contributed to this racial imbalance in the schools. Moreover, Plaintiffs argue that, other techniques used to improve the racial compositions at schools in Hillsborough County, such as the assignment and reassignment of satellite zones, were not used to reduce the percentages of black students at schools such as Robles. As a result, Plaintiffs assert that this Court must determine whether Defendants have been affirmatively seeking to integrate the Hillsborough County school system with respect to all of the factors outlined in *Green*, from 1971 until the present.

17. The phrase "school-age children" includes children 0 to 17 years old.

Undoubtedly, Defendants have been effective in desegregating the Hillsborough County school system. Hillsborough County is the 12th largest school district in the country. For the 1996–1997 school year, the county consisted of 149 public schools. Defendants point out that a majority of the schools have remained within a plus or minus 10% variance from the 80/20 race ratio suggested as ideal by the Court in 1971.[18] *See* 6th Annual Report at 42. Moreover, Defendants argue that, although the modifications have been made for reasons other than race, Defendants had no obligation to improve racial balances if the imbalances were not caused by either prior or present action of the School Board.

Defendants assert that, upon implementing their desegregation plan, none of the schools in Hillsborough County had a black majority population for the 1971–1972 school year.[19] Defendants point out that, although a few elementary schools began to increase their black population in the following years, the School Board implemented a supplemental plan with the Court's approval.[20] By the end of 1974, no schools had a black majority population.[21] Defendants argue that, from that point forward, the School Board has endeavored to maintain a desegregated school system in Hillsborough County. Defendants argue that, Plaintiffs' demand that: "all racially identifiable schools be eliminated," is contrary to the mandates of the Constitution. Defendants argue that they are not required to maintain a specific ratio at each school in the County.

Defendants admit that the schools which are now majority black schools and which are the focus of the Plaintiffs' Motion to Enforce Order, have steadily increased their black population over the course of this litigation; however, Defendants attribute this increase to the change in demographics, rather than, any action or inaction by the School Board.[22] Consequently, Defendants argue that they were not required to take affirmative action. Defendants contend that the only issue is whether the racial imbalances are traceable to the prior violation.

*Defendants' Expert*

During the 1996 unitary status hearing, Defendants' expert, Dr. Clark, testified about the differences in growth rates between the black and white populations of children 0 to 17 years old. Dr. Clark noted that, between 1970 and 1980, the white 0 to 17 population grew by under 3% while the black 0 to 17 population grew by almost 16%, five times as fast. (T2 at 20). From 1980 to 1990, the growth of the black population was almost twice as fast as the growth of the white population. *Id.* Dr. Clark explained that the growth in both segments of the population, as a whole, makes it possible to keep racial balance within a reasonable boundary. *Id.* However, according to Dr. Clark, the differential growth rate of the black 0 to 17 population indicates that the black school-age population was increasing proportionately faster, making it more difficult to keep the schools racially balanced. *Id.* at 21.

Significantly, Dr. Clark testified that changes in the populations did not occur uniformly across the county. Dr. Clark explained that Hillsborough County experienced a significant loss of white population

18. The 6th Annual Report submitted by Defendants provides the following statistics for the 1996–1997 school term: 18 schools had lower than 10% black student population; 30 schools had between 10–15% black student population; 46 schools had between 16–24% black student population; 18 schools had between 25–30% black student population; 14 schools had between 30–39% black student population; 9 schools had between 40–49% black student population; 14 schools had 50% or higher black student population.

19. As of October 27, 1971, there were no majority black schools among the 122 schools in the district and only one (1) school had more than a 40% black student population. (DX 7).

20. It should be noted that the supplemental plan was developed at the Court's insistence.

21. The 1975 Annual Report reflects that five (5) schools out of 128 had student populations which were in excess of 40% black. However, by the 1975–76 school year, one (1) school, Cleveland Elementary, had become a black majority school at 55%.

22. Using Robles Elementary as an example, the school was 43% black in 1979–80; 75% black in 1984–85; 80% black in 1986–87; 85% black in 1990–91; and 90% black in 1993. *See* (DX 7).

and a significant gain of black population in the inner-city area. *Id.* at 25. Therefore, according to Dr. Clark, any schools within the inner-city areas that are neighborhood schools, will reflect racial compositions similar to that of the composition of the inner-city areas. Dr. Clark testified that in 1970, there were about six (6) or seven (7) census tracts that had a 95% black 0 to 17 age population, whereas, in 1990, there were only three (3) census tracts with a 95% black 0 to 17 age population. *Id.* at 33. Nevertheless, Dr. Clark emphasized that the tracts with a 50% black 0 to 17 age population increased by about 40% between 1970 and 1990. *Id.* at 33–34.

Dr. Clark testified that, the shifts in the inner-city populations made it very difficult to adjust attendance boundaries to maintain a student body composition within a plus or minus 20% range of the district-wide ratios. *Id.* at 35. Dr. Clark explained that, as the areas with a 50% black 0 to 17 age population expand, as it has done in the inner-city of Hillsborough County, each school within those areas is impacted. *Id.* According to Dr. Clark, as the School Board attempts to make adjustments to the schools within the areas with a 50% or greater black population, and because these areas have expanded to encompass many different school attendance zones, each adjustment makes it increasingly difficult for the School Board to make additional adjustments that will effectively improve the race ratios in the other schools in those areas. *Id.* Defendants' Exhibit 8 geographically depicts the attendance zones of the racially imbalanced schools and clearly demonstrates that the schools which have become racially identifiable are located in the same vicinity as other schools with high black enrollments. Although there are additional adjustments which can be made to improve racial balance, the improvement would be at the expense of neighboring schools which are on the verge of becoming racially identifiable.

Dr. Clark analyzed fourteen (14) of the sixteen (16) schools which are racially imbalanced and grouped Robles, Cleveland, Edison, Oak Park, and Graham together because these schools became at least 40% black between 1970 and 1980. (Tr 2 at 36). The remaining schools were grouped because those schools deviated from the plus or minus 20% range between 1980 and 1990.

In 1970, the Robles attendance zone was comprised of 2,247 children between the ages of 0 to 17. (DX 2 Table 4). Only 292(13%) of those children were black. *Id.* In 1980, the Robles attendance zone was comprised of 2,496 children between the ages of 0 to 17. *Id.* During this time, 781 (31.3%) of those children were black. *Id.* Significantly, by 1990, the Robles attendance zone was comprised of 2,875 children between the ages of 0 to 17, by this time, 2054 (71.4%) of those children were black. *Id.* Dr. Clark emphasized that, while the total population of an area was not experiencing dramatic increases, the black population of school-aged children was increasing dramatically. Dr. Clark also pointed out that the satellite zone originally assigned to Robles was only 0 to 5% black school-aged children. However, in 1990, the satellite area, although no longer maintained, was almost entirely 75–95% black school-aged children and would have further increased the proportion of black students enrolled at Robles if it had not been removed. (T2 at 46);(DX 2 Table 4; Figure 10).

In 1970, Cleveland's attendance zone was comprised of 1,657 children ages 0 to 17. (DX 2 Table 4). During this time, only 46 (2.8%) of these school-aged children were black. *Id.* In 1980, the number of school-aged children in the attendance zone decreased to 1,544; however, by this time, 639 (41.3%) of the school-aged children were black. *Id.* In 1990, the number of school-aged children in Cleveland's attendance zone increased slightly to 1,578, and the black school-aged population increased to 654 (41.4%). *Id.* Dr. Clark explained that in 1970, there were a few blocks with in Cleveland's attendance zone that were between 0 and 5% and a few blocks that were comprised of between 5 and 25% black school-aged children. (Tr 2 at 40). By 1980, the black school-aged population was still concentrated in the same few blocks; however, by this time, those blocks were comprised of between 75 to 95% black school-aged children. *Id.* at 41. In 1990, those few blocks were not as concentrated with a black school-

aged population; however, the population spread out through a large number of blocks which were primarily 50 to 75% black 0 to 17 year old children. Moreover, black school-aged children made up of 95 to 100% of some of the neighborhood blocks closest to the school. *Id.*; (DX2 Figure 6).

Dr. Clark's testimony and report on the Demographic Change and School District Impacts in Hillsborough County (DX 2) highlights the changes in the attendance zones for the racially imbalanced schools. Dr. Clark described the increases in the black school-aged children in the attendance zones and concluded that the shift in the residential patterns in the inner-city of Hillsborough County accounts for the racial imbalances in these schools. Notwithstanding, the Court is compelled to question the reliability of Dr. Clark's statistics.

There are significant problems with the statistics used to explain the racial imbalances in the sixteen (16) schools under consideration. Defendants' statistics encompass a larger segment of the population than is useful to explain the deviations in the racial compositions of the unbalanced schools. Specifically, Defendants rely on Dr. Clark's use of school-aged children from ages 0–17 to explain enrollment ratios at the elementary schools; however, almost one-half of the children included in this group would not, in fact, be attending an elementary school.[23] Moreover, while a few blocks in an attendance zone may reflect black school-age populations as high as 95%, those few blocks only represent a small proportion of the entire attendance zone. Finally, Dr. Clark's analysis does not address Defendants' initial decisions to draw attendance zones, decisions not to act when it was apparent that those zones were inappropriate, or other School Board decisions, such as, location of new schools, or implementation (or lack thereof) of desegregation tools.

(ii) *Inflated Statistics*

The sweeping nature of Defendants' statistics is of particular concern. Dr. Clark's testimony placed great emphasis on the increase in the percentage of neighborhood

blocks which were comprised of a high concentration of black school-aged children within each of the schools' attendance zones. However, these statistics alone fail to adequately explain the racial compositions in these schools. For example, if the attendance zone is made up of fifty (50) neighborhood blocks, and three (3) of those blocks are 95 to 100% black, this still represents a small number of black students within the attendance zone. Moreover, while a certain block may have been as high as 100% black, that block may have only had four (4) school-aged children living on that block. To intensify the problem, three (3) of those children may have been high school, rather than, elementary school-aged children. While the shortcomings of Defendants statistics do not evidence deliberate discriminatory action, Defendants "bear[ ] the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman,* 503 U.S. at 494, 112 S.Ct. 1430. Therefore, even though Defendants' statistics may look significant at first glance, the Court is concerned about the reliability of those numbers.

A very real example is Dr. Clark's testimony regarding Cleveland Elementary. Dr. Clark pointed out that, in 1970, a few blocks in the attendance zone were comprised of between 5 and 25% black students aged 0 to 17. The black enrollment at Cleveland was around 20% in 1971. Significantly, over the next couple of years, Cleveland's black enrollment soared up to 40% and then, after a few more years, to 60%. (T2 at 40); (DX 2 Figure 6). Dr. Clark testified that, in 1970, there were a few blocks in Cleveland's attendance zone which were between 0 and 5% black and a few blocks which were between 5 and 25% black. To explain the correlation between the black populations in these neighborhood blocks and the black enrollment at Cleveland Elementary, Dr. Clark testified that, "[s]o that's—we would expect, then, that—if those children are going to the school there, we would expect the school to be somewhat in that range, and indeed it is. That's about what the percentage of black

---

**23.** The Court acknowledges that more precise figures were not available; however, the fact that the 0 to 17 age group logically encompasses children too young and too old to attend elementary schools, counsels against placing great weight on the use of these statistics.

enrollment is, and we're seeing it in the school." (T2 at 41). In other words, Dr. Clark concluded that, because there were a few neighborhood blocks in Cleveland's attendance zone that were as concentrated as 25% black, it explains why the black enrollment at Cleveland Elementary was around 20% in 1971 and then continued to climb as the concentration in the blocks increased. Interestingly, the *entire* attendance zone was comprised of only 46 (2.8%) black school-aged children during this time.

 A cursory inspection of Dr. Clark's graphical representation of these figures, reveals that these blocks with a high concentration of black school-aged students, represent a small portion of the entire attendance zone.[24] *See* (DX2 Figure 6). Moreover, Dr. Clark qualified his answer by saying, "if those children are going to the school there." However, in all likelihood, there would be several children who are outside of the *elementary school* age group; therefore, they would not, in fact, be attending that school. The fact that a small portion of the attendance zone has a high percentage of minority school-aged children does not explain why the *total black enrollment* of those elementary schools correlates to those few blocks with high percentages of minorities; especially since a percentage of those children in the attendance zone would not be attending the school in question.[25] Furthermore, it should have been quite easy for

Defendants to make adjustments to combat the sudden increases in minority enrollment if the increases resulted from a few concentrated blocks within the attendance area.[26]

Granted, in 1990, the percentage of black school-aged children in Cleveland's attendance zone had increased dramatically and the number of blocks with a majority of black school-aged children has increased; however, the same deficiencies are present in Dr. Clark's analysis and twenty (20) years had passed since Defendants received the directive to desegregate the Hillsborough County school system. These findings weigh heavily against Defendants' assertion that they responded affirmatively to the Court's desegregation mandates.

The racial composition at Robles is also illustrative of the deficiencies in Dr. Clark's explanation. For instance, in 1970, Robles' entire attendance zone was comprised of 2,247 children ages 0 to 17. During this time, only 292(13%) of these 0 to 17 year old children were black. However, the black enrollment at Robles Elementary in the early 1970's rose from around 20% to 30%. In 1980, the number of school-aged children in the attendance zone increased to 2,496. By this time, 781 (31.3%) of the school-aged children were black. However, black enrollment at Robles in the early 1980's was between 50 and 60%, and climbing. In 1990, the number of school-aged children in Robles' attendance zone increased to 2,875, and the black school-

---

24. While there has been no representation that the graphical representations have been drawn to scale, the numbers behind the graphics produce the same conclusion. For instance, Defendant's Exhibit 2, Figure 6, graphically represents that there are a few blocks within Cleveland's attendance zone that are comprised of between 5 to 25% black school-aged children. However, in sheer numbers, there were only 46 (2.8%) black school-aged children, out of 1,657 school-aged children, in Cleveland's entire attendance zone. Of course, some of those children were not attending the elementary school because the data encompasses 0 to 17 year olds. Although Dr. Clark testified that the 20% black population at Cleveland during the 1971–1972 school year was expected, it would appear that a 2.8% black student population would have been more fitting. Moreover, the fact that statistics have not been provided regarding the concentration of white school-aged children in the neighborhood blocks within an attendance zone, to compare to the concentration of black school-aged children, cre-

ates additional doubt as to the reliability of Defendants' statistical arguments.

25. The Court is constrained to interpret Defendants' data to represent small percentages of the attendance zones in question. Because there are no statistics available to the Court which denote the number of children represented by these neighborhood blocks or the number of *elementary*-aged school children within each elementary school attendance zone, it is difficult to accurately speak in terms of small or large percentages of these attendance zones.

26. The key question is whether Defendants were required to take steps to combat those increases after a racially neutral system of student assignment had been established. While the failure to make additional adjustments may not evidence deliberate racial discrimination, Defendants' failure to take "whatever steps necessary" is relevant to Defendants' good faith compliance, which will be discussed below.

aged population increased to 2054 (71.4%). However, black enrollment at Robles was over 80% black in 1990 and was approaching 90%.

Certainly, the significant increase in black school-aged children residing in Robles' attendance zone over the course of this litigation explains why the black enrollment in that school continued to increase. However, even if the Court were able to ignore the deficiencies in Dr. Clark's statistics which he used to explain the increase in black students at the elementary school level, the abiding question is: why wasn't the attendance zone adjusted, at least, initially? [27] Although Dr. Clark testified that various neighborhood blocks within the attendance zone had high percentages of black school-aged students, Defendants have not provided the Court with information on how many of those students actually attended elementary school. Significantly, in 1980, black school-aged students comprised only 31.3% of Robles' *entire* attendance zone; however, the *actual* enrollment at Robles during the 1980–1981 school year was 51% black. Notably, Defendants took no affirmative steps to address the fact that Robles had now crossed the 50% mark and no longer reflected the ideal composition suggested by the Court. Especially since the *entire* attendance zone was only 31.3% black and the *elementary school* was already 51% black.

*Plaintiffs' Expert*

Plaintiffs' expert, Dr. Shelley, studied the disparities between the percentage of black children 0 to 17 years old and the actual black enrollment in the five (5) schools which became racially unbalanced in the 1970s. Dr. Shelley subtracted the percentage of black children 0 to 17 years old living in a particular attendance zone from the percentage of black children actually attending the elementary school in that zone. (T4 at 51). For example, in 1970 Cleveland Elementary's attendance zone was comprised of 2.8% black children, but the actual attendance at Cleveland for the 1971–1972 school year was 18% black. Thus, Dr. Shelley testified that the difference between these two percentages

represents a disparity of approximately 15%. During the 1971–1972 school year, the disparities were as follows: Cleveland (15%), Edison (17%) Graham (10%), Oak Park (15%), and Robles (12%). In 1980, the disparities among these same schools were as follows: Cleveland (24%), Edison (14%) Graham (17%), Oak Park (4%), and Robles (20%). Finally, the disparities in 1990 were: Cleveland (13%), Edison (–2%) Graham (28%), Oak Park (4%), and Robles (14%). (PX2 Table 5).

Dr. Shelley testified that if natural demographic change was the cause of the racial imbalance in these schools, it would be reasonable to expect that the disparities would be consistent at these schools. (T4 at 53). In other words, if the natural demographic changes were the only cause of imbalance in these schools, the amount that the *actual* attendance of black students exceeds the *total* number of black children in each attendance zone would be fairly consistent from one school to another. *Id* at 56. Dr. Shelley explained that if demographic change is the cause of these imbalances, then "there is no reason to believe that the demographic factors such as birth rates are likely to differ substantially from one attendance area to another." *Id.* at 57. Moreover, Dr. Shelley noted, "[w]ithout evidence that there's a substantial disparity between these school attendance areas in terms of things like birth rates, we would expect there to be a consistent pattern of difference between the school attendance areas among these identifiable schools." *Id.*

Dr. Shelley testified that the degree of disparity during the 1971–1972 school year was relatively small. *Id* at 58. The range was from Graham with 10% to Edison with 17%. Dr. Shelley explained that this 7% difference was the degree of consistency that he expected, because it should have been, and remained, consistently small. *Id.* Notably, this was only one (1) year after the desegregation Order was issued, and, undoubtedly, the best year, in terms of desegregation, for the Hillsborough County school

---

27. By 1975 five (5) schools out of 128 had black enrollments of 40% or more: Cleveland, Edison, Gary, Graham, and Palm River Elementary.

system with regards to student assignments. However, by 1980, the disparity increased to a range of 4% (Oak Park) to 24% (Cleveland). *Id.* By 1990, the disparity increased from – 2% (Edison) to 28% (Graham). *Id.* Dr. Shelley testified that, unless the rates for births, deaths, migration, and other factors increased dramatically by attendance zone, there should not have been a dramatic increase in these disparities. *Id.* Although Defendants provided evidence that birth rates among African–Americans had increased disproportionately to those of whites, according to Dr. Shelley, the increase should have still produced consistent results among all African–Americans in these attendance zones.

■ Unfortunately, Defendants have taken the position that they were not required to make any adjustments if the School Board had not caused the racial imbalance. While this may be an appropriate legal argument to advance in unitary status proceedings in 1996, it appears as though Defendants imprudently incorporated this argument into their policy making since the 1970's. However, a party to a court order or decree must abide by its terms until it is later declared improper or unconstitutional. Defendants have always been charged with the obligation to eliminate the vestiges of past discrimination to the maximum extent practicable. *See Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971)("Having once found a violation, the district judge or school authorities should make **every effort** to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation.")(emphasis added); *Green v. County School Bd. of New Kent Co.,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)("School boards ...operating state-compelled dual systems were nevertheless clearly charged with the **affirmative duty to take whatever steps might be necessary** to convert to a unitary system in which racial discrimination would be eliminated root and branch.")(emphasis added). Furthermore, the Supreme Court has stated that, "[t]he remedy for such segregation may be administratively awkward, inconvenient,

and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems." *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 28, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). However, since the 1970s, Defendants have taken the position that they were not obligated to take additional steps in certain circumstances. In other words, the School Board unilaterally determined that they were not responsible for the racial imbalances; therefore, there was no need to take affirmative steps.

■ Although Defendants did not continue to employ aggressive desegregative techniques once the race ratios reflected the district-wide ratio, Defendants continued to "consider" the racial compositions of the schools as decisions were made. However, despite the fact that Defendants may have been successful in desegregating the school system, they are obligated to make affirmative efforts to desegregate until unitary status is declared. With regards to student assignments, affirmative efforts would have included reassigning students, rezoning, marketing the majority to minority programs, etc. The Court acknowledges that Defendants have made affirmative efforts to a limited extent; however, Defendants' failure to adequately address the racial imbalances which developed in the elementary schools relatively soon after the desegregation plan was implemented, does not exhibit a good faith commitment to desegregation.[28] In other words, regardless of the cause of the imbalances, until Defendants sought a determination through the proper judicial channels, they were obligated to address these racial imbalances pursuant to the Court's orders. Moreover, the fact that a school system resists resegregation fortuitously, does not demonstrate good faith compliance with the Court's orders.

Without reiterating all of the abovementioned concerns for Edison, Graham, and Oak Park, the Court will merely emphasize the

---

**28.** Unfortunately, Defendants may have been misled by the content of an *ex parte* communication conducted with the Judge and his staff who

previously presided over this case. This matter will be discussed below.

statistics the Court finds important. In 1970, Edison had 1,788 school-aged children in its attendance zone, 343 (19.2%) were black. The actual racial composition for the 1972–1973 school year was 36% black and 64% white. By 1980, 584 (39.9%) of the 1,463 total school-aged students in Edison's attendance zone were black. The actual racial composition for the 1980–1981 school year was 55% black and 45% white. By 1990, Edison's attendance zone included 836 school-age students, 590 (70.5%) were black. The actual racial composition of students in attendance for the 1990–1991 school year was 69% black and 31% white.

In 1970, Graham had 1,687 school-aged children in its attendance zone, 374 (22.2%) were black. The actual racial composition for the 1972–1973 school year was 35% black and 65% white. By 1980, 462 (35.9%) of the 1,288 total school-aged students in Graham's attendance zone were black. However, the actual racial composition for the 1980–1981 school year was already 52% black and 48% white. By 1990, Graham's attendance zone included 1,220 school-age students and 523 (42.9%) were black. The actual racial composition of students in attendance for the 1990–1991 school year was 68% black and 32% white.

In 1970, Oak Park had 1,649 school-aged children in its attendance zone, but only 117 (7.1%) children were black. The actual racial composition for the 1972–1973 school year was 23% black, more than three (3) times the total number of black children 0 to 17 years old in Oak Park's attendance zone. By 1980, 664(39%) of the 1,703 total school-aged students in Oak Park's attendance zone were black. The actual racial composition for the 1980–1981 school year was 43% black and 57% white. By 1990, Oak Park's attendance zone included 1,580 school age students and 897 (56.8%) were black. The actual racial composition of students in attendance for the 1990–1991 school year was 61% black and 38% white.

As discussed above, the percentages of school-aged children in an elementary school's attendance zone, naturally, overstated the actual percentages of students who were elementary school-age students. Notwithstanding, the actual black enrollment at the five (5) elementary schools discussed above almost exclusively exceeded the total number of school-aged students in the entire attendance zone. Since the *total* number of school-aged students in the attendance zones was an overstatement of *actual* attendees at the elementary schools at issue, and because the percentage of black school children actually attending each school almost always exceeded the "overstated" percentages, the Court is hesitant to accept Defendants' argument that a shift in demography is the sole cause the imbalance in these elementary schools.[29] Moreover, Plaintiffs have provided evidence that the discrepancies were not caused solely by a shift in demography. Defendants' failure to act affirmatively in light of these deviations necessitates continued supervision.

Interestingly, the parties focus almost exclusively on these sixteen (16) schools which have high percentages of black students in attendance. However, there is a significant number of other schools in which the racial compositions are disproportionate with the system-wide ratio. The fact that Plaintiffs failed to make much of this point is of no concern for the Court. The school system must be evaluated as a whole. In 1971, the Court expressed, in great detail, its concerns for all segregated schools. While the focus thus far has been on schools which have become racially identifiable as "black schools," the fact that there are numerous other schools which are virtually all "white" schools is equally concerning. The Court is concerned with every school which is becoming a one-race school. Although a school which is 90% white only deviates approximately 10% from the district-wide ratio, it is also only 10% from becoming an absolute one-race school.

In the May 11, 1971, Order, this Court explained that, "[i]t was the Supreme Court's

---

**29.** While Defendants point to other variables such as majority black satellite zones which may have contributed to these discrepancies, the point is that Defendants made the decision to select and implement these satellite zones without taking "whatever steps might be necessary" and without making "every effort" to achieve the greatest possible degree of actual desegregation, to the extent practicable.

view that while the existence of a small number of one-race schools is not a sure mark of a segregated system, in systems with a history of discrimination there is 'a presumption against schools that are substantially disproportionate in their racial composition.'" (1971 Order at 32)(quoting *Swann*, 402 U.S. at 26, 91 S.Ct. 1267). The Court also noted that of the seventy-nine (79) schools which the State Department of Education listed as white in a 1956 survey, in 1971, thirty-eight (38) were all or at least 95% white. *Id.* at 36, 91 S.Ct. 1267. According to Defendants' Exhibit 7, on October 24, 1994, there were eighteen (18) schools which were 90% or more white. Five (5) of those schools were 93% or more white. (DX 7). By October 30, 1995, twenty-four (24) schools were 90% or more white. Eight (8) of those schools were 93% or more white. (DX 7). By October 30, 1996, there were still twenty-four (24) schools which were greater than 90% white. Significantly, three (3) elementary schools had become 99% white and one (1) had become 97% white. At the junior high level, one (1) school had become 96% white and one (1) school had become 95% white. Consequently, the existence of these virtually one-race schools reveals that there were additional opportunities for Defendants to demonstrate a good faith commitment to desegregation.

Although Dr. Clark's report and testimony encompasses a degree of unreliability, based on the totality of the evidence, a shift in demographics is a substantial cause of the racial identifiability in Hillsborough County's schools. Plaintiffs' expert agreed that demographics have played a significant role in Hillsborough County; however, he asserted that additional factors should be considered and that it is premature to attribute racial imbalance in the schools to natural demographic change until the 2000 census is available. While the Court finds a lack of good faith commitment to desegregation by Defendants, the Court is not suggesting that all racial imbalance should, or could, have been eliminated. It is probable that these few schools would have become racially imbalanced regardless of Defendants' efforts. However, the degree and magnitude of the racial imbalance could have been lessened if Defendants had acted affirmatively over the last twenty-seven (27) years. Unfortunately, with the passage of time, the availability and effectiveness of remedies diminishes.[30]

The second group of schools studied by Dr. Clark included: Cahoon Elementary, Clair Mel Elementary, Foster Elementary, Shaw Elementary, Sulphur Springs Elementary, West Tampa Elementary, Witter Elementary, Dowdell Junior High, and Van Buren Junior High. These schools were grouped together because they deviated plus or minus 20% from the system-wide ratios between 1980 and 1990. (T2 at 36).

*Cahoon Elementary* [31]

In 1980, Cahoon's attendance zone was comprised of 1,882 children ages 0 to 17. During this time, 396(21%) of these school-aged children were black. During the 1979–1980 school year, Cahoon's actual racial composition was 28% black and 72% white. There was a boundary change implemented for the 1980–1981 school year which slightly reduced the percentage of black school children to 27%. However, in the 1986–1987 school year, the boundary change implemented increased the percentage of black students to 38%, from 33% the previous school year. In 1990, the number of school-aged children in the attendance zone increased to 2,015; however, by this time, 677 (33.5%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 38% black and 62% white. During the 1991–1992 school year, the actual racial composition for Cahoon was 41% black and 59% white. The actual racial composition of students in attendance at Cahoon for the 1995–1996 school year was 52% black and 48% white.

*Clair Mel Elementary*

In 1980, Clair Mel's attendance zone was comprised of 3,211 children ages 0 to 17. During this time, only 523 (16.3%) of these school-aged children were black. During the

---

30. Defendants are not solely to blame for the long delay. Between 1975 and 1994, Plaintiffs failed to object or otherwise complain about the existence of racially unbalanced schools.

31. The statistics used for these nine (9) schools were taken from DX 2, Table 5 and Appendix A to Defendants' Docket No. 796: *Boundary Changes, Race Ratios & Demographic Changes for the 14 Hillsborough County Schools with more than 40% Black Students.*

1979–1980 school year, Clair Mel's actual racial composition was 27% black and 73% white. During the 1985–1986 school year, the actual racial composition of students in attendance was 35% black and 65% white. In 1990, the number of school-aged children in the attendance zone decreased to 2,832; however, by this time, 1,112 (55.1%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 41% black and 59% white. The actual racial composition of students in attendance at Clair Mel for the 1995–1996 school year was 49% black and 51% white.

*Foster Elementary*

In 1980, Foster's attendance zone was comprised of 1,397 children ages 0 to 17. During this time, 438 (31.3%) of these school-aged children were black. During the 1979–1980 school year, Foster's actual racial composition was 36% black and 64% white. During the 1984–1985 school year, a sixth grade was added to Foster and one (1) white and fifty-two (52) black students were transferred from Foster to Lopez. In addition, Foster received fifty-four (54) white and twenty (20) black students from Orange Grove Elementary. Defendants assert that this transfer was implemented to accommodate the new sixth grade at Foster and to relieve the racial imbalances developing. During the 1984–1985 school year, the actual racial composition of students in attendance was 29% black and 71% white. In 1990, the number of school-aged children in the attendance zone decreased to 1,215; however, by this time, 637 (52.4%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 46% black and 54% white. The actual racial composition of students in attendance at Foster for the 1995–1996 school year was 61% black and 39% white.

*Shaw Elementary*

In 1980, Shaw's attendance zone was comprised of 2,330 children ages 0 to 17. During this time, only 312 (13.4%) of these school-aged children were black. During the 1979–1980 school year, Shaw's actual racial composition was 17% black and 83% white. During the 1985–1986 school year, the actual racial composition of students in attendance was 31% black and 69% white. In 1990, the number of school-aged children in the attendance zone increased to 2,696; however, by this time, 911 (33.8%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 38% black and 62% white. The actual racial composition of students in attendance at Shaw for the 1995–1996 school year was 56% black and 44% white.

*Sulphur Springs Elementary*

In 1980, Sulphur Springs' attendance zone was comprised of 1,600 children ages 0 to 17. During this time, only 242 (15.1%) of these school-aged children were black. During the 1979–1980 school year, Sulphur Springs' actual racial composition was 28% black and 72% white. During the 1985–1986 school year, the actual racial composition of students in attendance was 44% black and 56% white. In 1990, the number of school-aged children in the attendance zone increased to 2,771; however, by this time, 1,431 (51.6%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 62% black and 38% white. The actual racial composition of students in attendance at Sulphur Springs for the 1995–1996 school year was 74% black and 26% white.

*Witter Elementary*

In 1980, Witter's attendance zone was comprised of 1,523 children ages 0 to 17. During this time, only 267 (17.5%) of these school-aged children were black. During the 1979–1980 school year, Witter's actual racial composition was 23% black and 77% white. During the 1985–1986 school year, the actual racial composition of students in attendance was 32% black and 68% white. In 1990, the number of school-aged children in the attendance zone increased to 1,809; however, by this time, 743 (41.1%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 46% black and 54% white. The actual racial composition of students in attendance at Witter for the 1995–1996 school year was 54% black and 46% white.

*West Tampa Junior High/ Elementary* [32]

In 1980, West Tampa's attendance zone was comprised of 1,465 children ages 0 to 17.

---

32. West Tampa started out as a junior high school in 1971; however, it became a sixth grade

During this time, only 305 (20.8%) of these school-aged children were black. During the 1979–1980 school year, West Tampa's actual racial composition was 21% black and 79% white. During the 1985–1986 school year, the actual racial composition of students in attendance was 20% black and 80% white. For the 1986–1987 school year, West Tampa began serving grades K through 6. Defendants were required to implement numerous adjustments to complete this conversion. The actual racial composition of students in attendance at the "old" West Tampa Middle School before these changes were made was 25% black and 75% white. After these changes were made, the actual composition of students at the "new" West Tampa Elementary School for the 1987–1988 school year was 47% black and 53% white. For the 1988–1989 school year, twenty (20) white sixth graders were transferred from Lockhart to West Tampa which lowered the percentage of black students to 42%. In 1990, the number of school-aged children in the attendance zone decreased to 1,379; however, by this time, 436 (31.6%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 44% black and 56% white. The actual racial composition of students in attendance at West Tampa for the 1995–1996 school year was 47% black and 53% white.

*Dowdell Junior High School*

In 1980, Dowdell's attendance zone was comprised of 7,494 children ages 0 to 17. During this time, 2,070 (27.6%) of these school-aged children were black. During the 1979–1980 school year, Dowdell's actual racial composition was 22% black and 78% white. During the 1985–1986 school year, the actual racial composition of students in attendance was 37% black and 63% white. In 1990, the number of school-aged children in the attendance zone increased to 6,572; however, by this time, 2584 (39.3%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 41% black and 59% white. The actual racial composition of students in attendance at Dowdell for the 1995–1996 school year was 49% black and 51% white.

center in the 1979–1980 school year. It was subsequently converted to an elementary school

*Van Buren Junior High School*

In 1980, Van Buren's attendance zone was comprised of 10,998 children ages 0 to 17. During this time, only 1,613 (14.7%) of these school-aged children were black. During the 1979–1980 school year, Van Buren's actual racial composition was 28% black and 72% white. During the 1985–1986 school year, the actual racial composition of students in attendance was 30% black and 70% white. In 1990, the number of school-aged children in the attendance zone increased to 12,583; however, by this time, 4983 (39.6%) of the school-aged children were black. The actual racial composition for the 1990–1991 school year was 42% black and 58% white. The actual racial composition of students in attendance at Van Buren for the 1995–1996 school year was 53% black and 47% white.

A study of the nine (9) schools which became more than 40% black in the second decade since the desegregation Order was issued reveals that the disparities between the percentages of black school-aged children in the attendance zones and the actual enrollment of black students are not as dramatic as the five (5) schools which became 40% black within the first decade. Nevertheless, the actual percentages of black students attending these nine (9) schools exceeded the total number of black children 0 to 17 years old in the attendance zones in virtually every instance. However, as discussed above, the failure to actively address these imbalances is more relevant to Defendants' good faith compliance with the Court's orders, rather than to the issue of whether Defendants currently have desegregated student assignments. Importantly, the fact that these schools did not become racially unbalanced until the 1980s provides support for Defendants' contention that gradual expansion of the black school-aged population caused the racial imbalance in these schools. "As the de jure violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior de jure system." *Freeman v. Pitts*, 503

in 1986.

U.S. 467, 496, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). However, the *Freeman* Court noted that, "[t]he causal link between current conditions and the prior violation is even more attenuated if the district has demonstrated its good faith." *Id.*

Defendant's other expert, Dr. Armor, testified about student race ratios within Hillsborough County. In addition, Dr. Armor summarized his findings in a report which was admitted into evidence as Defendants' Exhibit 1. Similar to the Court's definition of racially identifiable, Dr. Armor defined "racially balanced" schools as those schools that are within a plus or minus 20% variance from the district-wide racial composition. (DX 1 at 5). Dr. Armor indicated that prior to the Court's 1971 Order, only 12% of black students and 56% of white students attended racially balanced elementary schools. (DX 1 App. 1). During the first three (3) years of Defendants' desegregation efforts, 97 to 98% of black students and 99% of white students were in racially balanced schools. (T3 at 23). The percentage of white students that attended racially balanced schools remained above 90% through 1995, with the lowest percentage being 92%. (DX 1 App. 1). The percentage of black students attending racially balanced schools remained above 80% until 1989, was between 77% and 79% from 1989 through 1991, and since then, has remained around 70%. *Id.* Dr. Armor noted that "Hillsborough County has had a greater percentage of elementary students in racially balanced schools, and for longer durations, than any other districts I have evaluated in the Eleventh Circuit: DeKalb County, Savannah, and Muscogee County, Georgia." (DX1 at 5).

With regards to the junior and senior high schools, Dr. Armor reported:

Charts 2 and 3 [which are appended to the report] show the percentage of junior and senior high students in racially balanced schools. Again, only 31 percent of black junior high and 54 percent of black senior high students were in racially balanced schools in 1970 before the court-ordered plan. Between 1971 and the mid-1980s, however, the rate reaches 100% in most years. Over 80 percent of black junior high students were in racially balanced schools until 1993, and all of the high schools have been balanced for the past three years. These rates for secondary schools are better than or comparable to other unitary school districts I have studies (sic).

(DX 1 at 6). In 1994, 79% of the black junior high school students attended racially balanced schools and in 1995, the percentages dropped to 75%. *Id.* From 1993 through 1995, 100% of the high schools were racially balanced.

Dr. Armor also testified about the dissimilarity and exposure indices for schools in Hillsborough County. A dissimilarity index is a statistical measure of the degree of racial balance. On a scale from zero (0) to one hundred (100), zero (0) represents perfect racial balance, i.e., a racial balance equal to the district-wide composition, and one hundred (100) represents a system with all one-race schools. (T3 at 27). Dr. Armor explained that the numbers in between correspond to the approximate proportion of students (both races) that would have to change schools in order to achieve a perfect racial balance, i.e., 23% black and 77% white. *Id.* According to Dr. Armor, any number below 30 indicates a very high degree of racial balance. *Id.*

On the other hand, the exposure index is the average percentage of white students in schools attended by black students. *Id.* at 29. Dr. Armor explained that it can be thought of as being a measure of the potential racial contact that black students experience in Hillsborough County. *Id.* Dr. Amor reported that:

In 1970, the dissimilarity index is very high at 83, which is about average for southern schools districts at that time. The index drops below 20 between 1971 to 1973, which is about as low as it gets in large districts. The index increases gradually over the next twenty years, but it remains below 30 until 1991. For comparison purposes, the average dissimilarity index for large southern districts with mandatory desegregation plans was about 35 during the 1980s.

The exposure index remains within ten points of its maximum value until the mid-1980s, but even at the present time it is 63,

which means that the average black student attends a school that is 63 percent white. In contrast, national figures show that the average exposure index for large southern districts had fallen below 50 by 1990, in large part because of white flight and falling enrollments. (DX1 at 6). Dr. Armor explained that there is a greater degree of desegregation at the junior and senior high schools. "The exposure index is 70 or higher at the present time, and the dissimilarity index has remained below 30 since the beginning of the desegregation plan." *Id.*

Consequently, Dr. Armor concluded that the district-wide figures demonstrate that, "the district has maintained a very high degree of desegregation up to the present time. Hillsborough County has higher levels of desegregation than the average large southern district, and it has higher levels of desegregation than other districts which have been declared unitary in the Eleventh Circuit." *Id.* at 7.

Dr. Armor also studied the student race ratios at all schools whose enrollments fell outside of the plus or minus 20% variance (whether or not it fell outside at the time he conducted his studies) for two (2) or more years between 1971 and 1995. *Id.* There were only twenty-two (22) schools, out of nearly 150 regular schools in the district, and only 15(10%) of the district schools were outside of the variances as of October 1995.[33] *Id.* Dr. Armor noted that none of the schools which were over 40% black as of October 1995, had been a former black school and none of these schools had a majority black enrollment before the 1971 Order. *Id.* at 7. Dr. Armor also emphasized that all of the schools that are over 40% black, except one (1), are located in the areas that Dr. Clark testified have experienced a substantial demographic change in the form of increasing black populations. *Id.*

In his analysis of the twenty-two (22) schools, Dr. Armor included a review of boundary changes that had the potential to affect racial composition by more than two (2) or three (3) percentage points. Dr. Ar-

mor compared the actual racial composition before the change to the projected racial composition after the change. *Id.* Dr. Armor concluded that the shift in demographics outlined by Dr. Clark explains why these schools moved outside of the plus or minus 20% range and that, despite the school board's efforts to improve racial balances, the boundary changes played a "relatively minor role in the racial composition of these schools, being completely overwhelmed by demographics." (DX 1 at 11). Moreover, ·Dr. Armor testified that, "none of the schools that were currently imbalanced or were imbalanced in the past were caused by board action. They were caused by demographics." (Tr3–53). Dr. Armor concluded that, "the [School] Board did implement a highly effective desegregation plan that virtually desegregated the entire district to a very high degree of desegregation, as high as I've ever seen anywhere in this country, but especially in the south, and that it maintained that plan for a very long time." (T3 at 49).

Plaintiffs expert, Dr. Shelley, also recognized that the boundary changes were not significant in improving racial compositions. Dr. Shelley reported that boundary changes have not consistently contributed to reducing racial imbalance. (PX2 at 9). Dr. Shelley indicated that half of the boundary changes affecting the racially imbalanced schools reduced the percentage of black students at that school and the other half, resulted in an increase. Dr. Shelley admitted that it is possible that a boundary change that improves racial balance in one (1) school could exacerbate racial imbalance in another. *Id.* However, Dr. Shelley opined that since Hillsborough County, as a whole, is not highly segregated, it should be possible to redraw boundary lines without adversely impacting neighboring schools. *Id.* at 17.

Significantly, Dr. Shelley's conclusions regarding redrawing boundaries were based solely on the five (5) elementary schools which became racially imbalanced between 1970 and 1980. *Id.* at 19. While Dr. Shelley emphasized that the attendance

33. It should be noted that Dr. Armor's studies excluded schools which were 93% or more white because they did not deviate by 20%. However, these "white" schools cannot deviate by 20% or more until they become virtually 100% white.

zones of these five (5) schools do not adjoin one another, he failed to evaluate the attendance zones of all the schools which do adjoin the racially unbalanced schools. Defendants' Exhibit 8 graphically depicts the attendance zones for the sixteen (16) racially unbalanced schools and clearly illustrates the difficulties in redrawing attendance zones. Undoubtedly, it would be possible to bus children across the county to ensure racial compositions that comport with the district-wide ratios; however, that would not be practicable and was not required by the Court's 1971 Order. Moreover, it is not required by the Constitution or governing law. Although affirmative steps are required to achieve the greatest practicable desegregation, heroic measures to ensure racial balance system-wide are not. *See Freeman*, 503 U.S. at 493, 112 S.Ct. 1430.

■ A distinction must be made between requiring Defendants to maintain specific race ratios and requiring Defendants to make affirmative efforts to desegregate the school system. It is clear that Defendants were not obligated to maintain specific race ratios at each school in the county. "Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." *Swann*, 402 U.S. at 31–32, 91 S.Ct. 1267. However, the Court is concerned that Defendants have not yet accomplished that affirmative duty. Defendants have an affirmative duty to eliminate the former dual school system. As noted above, the ultimate goal of a desegregation remedy is "a unitary, nonracial system of public education." *Green*, 391 U.S. at 436, 88 S.Ct. 1689. The school system no longer discriminates against school children on the basis of race when it affirmatively has eliminated all vestiges of state-imposed segregation. *Id.* at 435, 437–38, 88 S.Ct. 1689.

■ "What is involved here is the question whether the School Board has achieved the 'racially nondiscriminatory school system' Brown II held must be effectuated in order to remedy the established unconstitutional deficiencies of its segregated system." *Green*, 391 U.S. at 437, 88 S.Ct. 1689. The inquiry is whether the School Board has taken steps adequate to abolish its dual segregated system. *Id.* The Supreme Court in *Green* explained that school boards which were "operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Consequently, until a school system has discharged its duty to convert the dual system to a unitary one, the School Board's duty remains in place.[34] However, the Supreme Court in *Green* was faced with a school district that had not yet implemented an effective desegregation plan.

■ Since *Green*, the Supreme Court has had numerous opportunities to evaluate the effectiveness of desegregation plans which had already been implemented. In *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) and *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Supreme Court emphasized that, once a school system has achieved unitary status, a court may not order further relief to counteract resegregation that does not result from the School Board's discriminatory acts.[35]

The *Pasadena* case involved the appropriateness of the district court's requirement that the desegregation plan contain provisions insuring that minorities could never become the majority at any of the district's schools. *Id.* at 432, 96 S.Ct. 2697. Although

---

**34.** The *Green* Court also noted that, " 'the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " 391 U.S. at 438 n. 4, 88 S.Ct. 1689.

**35.** The Supreme Court has declined to precisely define the term "unitary" in a desegregation

context. *See Dowell*, 498 U.S. 237 at 245, 111 S.Ct. 630, 112 L.Ed.2d 715. However, to the extent the term is used to describe a situation where court supervision is no longer necessary, it must encompass a finding of good faith commitment. *See Freeman*, 503 U.S. at 490, 112 S.Ct. 1430.

the Court in *Pasadena* only confronted "the question of whether the District Court was correct in denying relief when [the school district] in 1974 sought to modify the 'no majority' requirement as then interpreted by the District Court[,]" the Court reiterated the scope of permissible judicially created relief which is available to remedy violations of the Fourteenth Amendment. *Id.* at 432, 434, 96 S.Ct. 2697. The *Pasadena* Court explained that the district court had no authority to impose such an inflexible requirement when the subsequent changes in the racial composition of the schools might be caused by factors for which the school district could not be considered responsible. *Id.* at 434, 96 S.Ct. 2697. However, *Pasadena* cannot be applied as broadly as Defendants suggest.

The *Pasadena* Court held that, because the school district had obtained the objective of racial neutrality in its school attendance pattern when its desegregation plan was initially implemented, the district court could not require the school district to rearrange its attendance zones each year in order to ensure that the racial mix desired by the court was maintained in perpetuity. 427 U.S. at 436, 96 S.Ct. 2697. The Court explained that, "once [the school district] implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations ..., the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." *Id.* at 437, 96 S.Ct. 2697.

Significantly, the *Pasadena* Court cautioned against applying its rulings generally. The *Pasadena* Court explained that it was error to enforce the district court's order to "require annual readjustment of attendance zones so that there would not be a majority of any minority in any Pasadena public school." *Id.* at 435, 96 S.Ct. 2697. Subsequently, the Supreme Court distinguished the inflexible portion of the plan in that case from desegregation plans involving an evaluation under governing case law. *Id.* The *Pasadena* Court explained:

[I]t is important to note what this case does not involve. The "no majority of any minority" requirement with respect to attendance zones did not call for defendants

to submit "step at a time" plans by definition incomplete at inception. Nor did it call for a plan embodying specific revisions of the attendance zones for particular schools, as well as provisions for later appraisal of whether discrete individual modifications had achieved the "unitary system" required by Brown. The plan approved in this case applied in general terms to all Pasadena schools, and no one contests that its implementation did "achieve a system of determining admission to the public schools on a nonracial basis."

*Id.* (internal citations omitted).

In order to align the instant case with *Pasadena* and *Swann*, with regards to student assignments, it must be clear that: (1) the implementation of Defendants' desegregation plan established a racially neutral system of student assignment in Hillsborough County; and (2) any post-1971 changes in the racial composition of the schools in Hillsborough County were not in any manner caused by segregative actions chargeable to Defendants.

In the case at hand, the parties do not dispute that all of the schools in Hillsborough County were desegregated as of the 1971–1972 school year. As of October 27, 1971, there were no majority black schools among the school district's 122 schools and only one (1) school, Lee Elementary, had more than a 40% black student population. Moreover, Plaintiffs do not assert that Defendants' system of student assignments continued to segregate students after the desegregation plan was initially implemented. Plaintiffs did not file any written objections in this case concerning the actual or projected enrollments of any school in Hillsborough County for more than twenty-two (22) years after the 1971 desegregation plan was implemented. Plaintiffs failed to object to the racial compositions developing in the school system, despite the fact that Lee Elementary had become more than 50% black and Cleveland, DeSoto, Edison, and Gary Elementary had become more than 40% black as early as 1974. Moreover, Plaintiffs did not file their first objections to projected racial enrollments until June 1994. Plaintiffs' inaction

indicates that there were no perceived violations of the 1971 Order.

 There is no indication that the racial identity of the schools in Hillsborough County has been deliberately caused by segregative policies or practices by Defendants. Nevertheless, there is a presumption that the racial imbalance is traceable to the prior *de jure* dual system and Defendants must prove otherwise. The Court suspects that Defendants' inaction has contributed to the degree of racial unbalance in the school system. Notably, the 1971 Order was required because the School Board refused to act after the Supreme Court decided *Brown I* and *Brown II* in the 1950s. Importantly, the Supreme Court has emphasized that a mere racially neutral assignment plan may be inadequate. *Swann,* 402 U.S. at 28, 91 S.Ct. 1267. A neutral student assignment system will be insufficient if it "fail[s] to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain artificial racial separation." *Id.* at 28, 91 S.Ct. 1267. While the Court acknowledges that a race neutral attendance pattern was implemented in the case at hand, Court supervision remains necessary. Neutrality alone is not sufficient.

] "The district judge or the school authorities should make every effort to achieve the **greatest possible degree** of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools." *Swann,* 402 U.S. at 26, 91 S.Ct. 1267 (emphasis added). While the effective implementation of a desegregation plan may satisfy an element of the school districts' obligation under a desegregation order or consent decree, the courts' supervisory responsibility remains until a school board has: (1) eliminated the vestiges of past discrimination to the extent practicable; (2) exhibited a record of full and satisfactory compliance with the decree; and (3) "demonstrated to the public and the parents of the once disfavored race, its good faith commitment to the whole of the court's decree and to those provisions of the laws and the constitution

that were the predicate for judicial intervention in the first place." *See Lockett v. Board of Education of Muscogee County School Dist.,* 92 F.3d 1092, 1098 (11th Cir.1996)(quoting *Freeman,* 503 U.S. at 491, 112 S.Ct. 1430)("*Lockett I*"); *Lockett v. Board of Education of Muscogee County School Dist.,* 111 F.3d 839, 842 (11th Cir.1997)("*Lockett II*"). "[O]ne of the prerequisites to relinquishment of control in whole or in part is that a school district has demonstrated its commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution." *Freeman v. Pitts,* 503 U.S. 467, 490, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

 "Once [Defendants] implemented a racially neutral attendance pattern in order to remedy [the specific] perceived constitutional violations on the part of the Defendants, [this Court] had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." *See Pasadena,* 427 U.S. at 437, 96 S.Ct. 2697. However, Defendants were not relieved from their obligations once a means to an end was implemented.[36]

> [A] school district does not escape its obligation to make affirmative efforts to remedy racial imbalances simply because the imbalances are caused by circumstances "over which [the school district] has no control"; instead, while under court supervision the school district must make efforts to eradicate all imbalances which are traceable to prior de jure segregation.

*Lockett v. Board of Education of Muscogee County School Dist.,* 92 F.3d 1092 (11th Cir. 1996) (citing *Freeman,* 503 U.S. at 491, 112 S.Ct. 1430). The School Board's obligations remain until the Court finds that the racial imbalances are not traceable to prior *de jure* segregation. Significantly, such a determination has not been made in the case at hand.

In *Lockett* I, the Eleventh Circuit entertained arguments which were similar to those advanced by the parties in the instant case. The school district initially implemented stu-

---

**36.** Moreover, the fact that the parties entered into the 1991 Consent Order, requires additional consideration. Not only did Defendants remain obligated to fulfill their duties, in good faith, pursuant to the equitable relief ordered by the Court in 1971, but the Consent Order embodies an agreement of the parties and is contractual in nature to some extent.

dent reassignment and attendance zone adjustments which effectively achieved its goal of proportionate student representation, pursuant to the district court's 1971 desegregation Order. *Id.* at 1095. Throughout the 1970s, the school district maintained consistent statistical racial compositions within its schools. *Id.* at 1096. During the same period, the racial compositions of faculty and staff within most of the district's schools reflected the county-wide averages. *Id.*

However, by the end of the 1970s, the school district in *Lockett* began to curtail its desegregation efforts by reducing the number of student reassignments and attendance zone adjustments. *Id.* During this same time period, the demographics of the county began to shift. *Id.* By the mid–1980s, there was a decline in the number of schools with acceptable racial compositions and by 1991, a number of racially identifiable schools existed. *Id.* In 1993, the school district moved for a final dismissal and a declaration of unitary status. *Id.* In 1994, after an evidentiary hearing on the matter, the district court granted the school district's motion. *Id.*

Although the Eleventh Circuit initially reversed the district court (*Lockett I*), the Circuit Court subsequently granted the school districts' petition for rehearing and held that the district court's factual findings were not clearly erroneous and affirmed the district court's decision (*Lockett II* ). *Lockett v. Board of Education of Muscogee County School Dist.*, 111 F.3d 839 (11th Cir.1997). Notwithstanding, the Eleventh Circuit in *Lockett I* reiterated established principles of law which are applicable to the case at hand.

 In *Lockett I*, the school district argued that unitary status had been achieved by the 1980s and therefore, they were released from their obligations under the 1971 Order at that time, even though unitary status was not declared until 1994. 92 F.3d at 1097. Conversely, the plaintiffs argued that, "the school district's obligation to make affirmative efforts to desegregate the school system commenced in 1971 and did not end until the district court declared unitary status in 1994." *Id.* Moreover, plaintiffs argued that, the school district's failure to make good faith efforts to desegregate the system after the 1980s contributed to the racial imbalances in the schools. *Id.* Significantly, the Circuit Court made it clear that, "[t]he school district was subject to the 1971 court order until such time as the district court vacated that order by declaring that the school district had achieved unitary status and complied with the order in good faith." *Id.* (citing *Pasadena*, 427 U.S. at 439–40, 96 S.Ct. 2697).

In the case at hand, Defendants continued their desegregation efforts after they initially achieved acceptable racial compositions throughout the school system in the 1970s. Moreover, Defendants continue to employ new desegregation techniques to date. Therefore, this case is somewhat distinguishable from *Lockett I*. The school district in *Lockett* implemented a neighborhood assignment plan which "affirmatively increased racial imbalances," whereas, Defendants in the instant case have not. *See Id.* at 1101. Furthermore, in *Lockett*, the school district never implemented a majority to minority transfer program, "a tool basic to 'every' desegregation program." *Id.*

 Although Defendants in the case at hand have not "affirmatively" exacerbated racial imbalances and have implemented, *inter alia*, a majority to minority transfer program, Defendants "curtailed" their desegregation efforts.[37] Defendants never sought a determination of unitary status until the issue was raised *sua sponte* by the Court; however, for years, Defendants have failed to adequately address schools which became racially imbalanced. While the evidence presented by the parties establishes that a shift in demographics played a significant role in the racial compositions of the schools, Defendants have not demonstrated a good faith commitment to desegregation. Certainly, Defendants deserve acknowledgment for their desegregation efforts thus far; however, the Court intends that its criticisms will serve as a guide to Defendants as they implement desegregation techniques in the future. Defendants must take affirmative steps in order to be released from the Court's super-

---

**37.** With regards to the instant case, the term "curtail" may be slightly misleading. In some instances, Defendants had not implemented basic desegregation techniques until the 1990s.

vision. "Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 459, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).

## II. Good Faith

### A. Desegregation Techniques

Defendants have been relatively successful in implementing desegregation techniques; however, Plaintiffs assert that Defendants have not utilized the available techniques to the maximum extent practicable. The number of racially unbalanced schools in Hillsborough County is relatively small. As of 1995, there were twelve (12) schools which were 50% or more black and five (5) schools that were between 40 and 49% black. Also, as of October 30, 1995, there were eight (8) schools which were 93% or more white. While Defendants may have believed that they had no obligation to adjust attendance zones to affirmatively combat segregation, other desegregative devices were available. Moreover, despite the impracticalities attendant to attendance zone adjustments, Defendants have had additional opportunities to desegregate the school system to the maximum extent practicable.

### (i) Majority to Minority Transfers

Plaintiffs argue that, even though majority black schools existed since, at least 1977, as of April 19, 1996, there was not one (1) majority to minority ("MTM") transfer granted. (Br. in Supp. of Pls.' Obj. to R & R at 17); (T1 at 91); (PX 14). Moreover, Plaintiffs argue that, despite the fact that a MTM transfer program was part of the Court's 1971 desegregation Order, Defendants did not market its MTM program to eligible students and their families until 1995, and no transfers had been processed as of April 1996. Plaintiffs argue that MTM transfer programs are a commonly used desegregation technique which is effective and does not require changes in attendance zone boundaries. However, Plaintiffs assert, Defendants have been negligent in fulfilling their desegregation obligations. Certainly, the history of this technique in Hillsborough County is concerning.

Plaintiffs argue that, there is no evidence that: (1) a MTM transfer was ever seriously considered until recently; (2) Defendants understood how to operate a MTM program; or (3) Defendants made any efforts to implement an effective MTM transfer program. Plaintiffs point out that the Administrative Assistant to the Superintendent, Dr. John Miliziano, testified that he was unaware of how MTM transfer programs worked in other school districts and that he had not read any literature concerning MTM programs. (T1 at 87–89). Also, Dr. Miliziano testified that it was not until the issue of an ineffective MTM program was brought up by Plaintiffs that the program was announced to the district as a whole and Defendants took action to publish information about the program. *Id.* at 89. Dr. Miliziano testified that he believes some children have been approved for transfers since the School Board took action. *Id.*

Dr. Miliziano testified that the utility of the MTM transfer program was not fully appreciated in the past and that it is possible that students who had been denied a transfer under the special assignment program, could have been eligible for a transfer under the MTM program. (T1 at 91–93). However, it is clear that, when the desegregation plan was proposed to the Court in 1971, Defendants understood the utility of a MTM program. In the Court's July 2, 1971, Order (Docket No. 250), the Court explained that the MTM program, other transfer rules, the Bi-Racial Committee, and approval of site locations had been required by previous orders. (July 2, 1971 Order, at 9). The Court noted that these programs and procedures may not be required if the School Board's plan is effectuated and accomplished. *Id.* Interestingly, Defendants, perhaps being overly optimistic, sought to avoid the implementation of the MTM program before the desegregation plan had been approved. The Court acknowledged:

In its responsive memorandum of June 28, 1971, the defendants say:

"(a) ... Should the Desegregation Plan submitted by Defendants to the Court be approved, there would seem no purpose for retaining the majority to minority provi-

sions for transfer, since such plan should result in a black to white ratio of approximately 20% to 80% in each and every school; accordingly, and of necessity, black students would be in a minority in schools at all levels...."

*Id.* Nevertheless, the Court opined that it would retain jurisdiction and "require the continuation of all of these procedures to be available and used as necessary." *Id.* The Court subsequently discussed Defendants' continuing responsibility and noted that, to effectuate the plan "will require the same type of community involvement, diligence and effectiveness as has already been shown [in developing the desegregation plan]." *Id.* at 9–10.

During the 1996 evidentiary hearing, the following exchange took place:

Q. [Dr. Miliziano] [a]re you aware of the treatment of majority to minority transfers in the original 1971 order?

A. To tell you the truth, Mr. Gonzalez, I was—I read that order probably a dozen times. I really was a bit confused as to what that meant.

Q. Okay. Let me represent to you that the court order contains the language with respect to that majority to minority transfer: "The court is retaining jurisdiction and will require the continuation of all of those procedures to be available and used as necessary."

Are you aware of the plaintiffs or any of the plaintiffs' representatives ever suggesting that MTM transfers were necessary again?

A. To my knowledge, no.

Q. Are you aware of anyone associated with the Legal Defense Fund ever complaining about the fact that that program was hidden or not available to students?

A. To my knowledge, no. And I dealt with the Biracial Committee for many years, and no member of the committee ever brought that up. And to tell you the truth, I thought it was one of those things that was considered by the court and it was never meant to apply.

It wasn't until recently that I, a person who has spent many, many years in dealing with the court order, maybe it's stupidity on my part, but I didn't even know that this hidden clause—this clause, not hidden, but this clause in the consent order meant really anything.

It wasn't until recently that it was brought to my attention that, hey, this thing is supposed to be done, and now that you have schools that are 50 percent black or higher, you're supposed to implement this policy.

(T1 at 106–07).

Plaintiffs argue that Dr. Miliziano's lack of understanding regarding the MTM program is significant because no Hillsborough County school system employee has more extensive school desegregation responsibilities than Dr. Miliziano. Plaintiffs maintain that the failure to understand and aggressively market the MTM program to the parents of children attending majority black schools illustrates Defendants' lack of good faith commitment to desegregation. Moreover, Plaintiffs maintain that this is another example of a lost opportunity.

It is very disturbing that Defendants' "in-house" desegregation expert testified that he did not completely understand the import of the MTM program. In 1971, Defendants argued that the transfer program would be unnecessary because all schools would be minority black. However, in 1996, Defendants assert that the usefulness of the program was not understood or appreciated. Notwithstanding, in Exhibit 2 to the Court's July 2, 1971, Order, the Court explicitly outlined the rules to be applied in connection with transfers and identified MTM transfers as the first exception to the transfer rule. Certainly, Defendants' lack of appreciation casts doubt on the competence of the individuals charged with the task of desegregating the schools. Moreover, Defendants could have sought clarification from the Court over the last two (2) decades.

The Magistrate Judge explained that, "[a]lthough the absence of M to M transfer applications is troubling, the Court's 1971 Order did not require the defendants to solicit M to M transfers; they were only required to grant them if requested. There has been no violation of the Court's Order as to the M to M transfer policy." (R & R at 74). Notwithstanding, the Court finds that this interpreta-

tion of Defendants' ongoing obligations is too narrow. While the Court did not specifically direct Defendants to market the program, surely if Defendants fully embraced their desegregation obligations they would have wanted to utilize this technique to the fullest extent or at least, made an effort to understand it.

In the May 11, 1971, Order, the Court explained that,

Since 1954 it has been clear that segregated schools are illegal and that the school boards and the courts, if necessary, have a duty to take affirmative action to desegregate them.

On April 20, 1971, it became and is crystal clear that affirmative action ordered by this and other courts for that purpose, and consistently opposed by certain defendants, is legal.

\* \* \* \* \* \*

Some of this may not be known by some or all members of the present board, although it should be. To be sure that they do know, a copy of this Order and a copy of the April 20, 1971, Supreme Court opinion in *Swann v. Charlotte–Mecklenburg Board of Education*, will be sent separately to each defendant. It is assumed that being informed each will fulfill his or her sworn obligation to "support and defend the Constitution of the United States," as did the Court. Each should remember that he *is* a defendant, and that the Court *will* uphold its obligation.

(May 11, 1971, Order at 1–2) (citation omitted).

Significantly, the Supreme Court in *Swann*, emphasized that,

[a]n optional majority-to-minority transfer provision has long been recognized as a **useful part of every desegregation plan.** Provision for optional transfer of those in the majority racial group of a particular school to other schools where they will be in the minority **is an indispensable remedy for those students willing to transfer to other schools in order to lessen the impact on them of the state-imposed stigma of segregation.** In order to be effective, such transfer program must grant the transferring student free transportation and space must be made available in the school to which he desires to move.

402 U.S. at 26–27, 91 S.Ct. 1267(emphasis added).

The Court ordered service of this Supreme Court opinion on Defendants in 1971; however, Defendants failed to take the time to understand, let alone implement, an effective MTM program. The Supreme Court in *Swann* ordered that school districts provide free transportation to the student and make space available, but twenty (20) years later, Defendants seek to hide behind the fact that this Court did not specifically indicate that the program should be publicized. This falls far short of demonstrating good faith compliance and, is indeed, troubling.

Defendants have also gone to great lengths to align the instant case with the Supreme Court decision in *Freeman*. However, there are some substantial difference between the two (2) cases. Foremost, the school district in *Freeman* was comprised of 5.6% black students when the desegregation order was initially entered in 1969. 503 U.S. at 475, 112 S.Ct. 1430. Significantly, by 1986, the percentage of black students had grown to 47%, whereas, in the case at hand, the influx has not been nearly as remarkable. *Id.* Moreover, the county had become highly segregated in *Freeman*. *Id.* In addition, the school district in *Freeman*, on its own initiative, implemented a majority to minority transfer program three (3) years after the desegregation order was entered. *Id.* at 479, 112 S.Ct. 1430. "The program was a marked success." *Id.* Conversely, in the instant case, Defendants had not granted one (1) majority to minority transfer as late as 1996, twenty-five (25) years after the desegregation order was entered.

#### (ii) *Magnet Schools*

In addition, Plaintiffs emphasize that Defendants failed to develop magnet schools and/or programs, except for the magnet program at Tampa Bay Technical High School, until 1993. Plaintiffs contend that magnet schools have been used by school districts for desegregation purposes since the 1970s. (PX1 at 10). Moreover, the federal government has provided special funds for such

schools since the 1980s. *Id.* However, the Hillsborough County school system did not create its first magnet schools until 1993. *Id.* While Defendants deserve praise for implementing these magnet schools/programs, the prolonged delay detracts from their achievement.

Plaintiffs argue that implementation of the Middle School Plan is still in progress and it is impossible to foresee the ultimate racial composition of all schools until the plan is completely implemented. Plaintiffs maintain that the race ratio projections for 1997, taken from the 1991 plan, were not met. Plaintiffs point out that the experience thus far, with regards to West Tampa, Edison, Cleveland, Sulphur Springs, and Clair Mel, has been that the proportion of black students at these schools has exceeded the projections made in 1991. Plaintiffs contend that if Defendants fail to take affirmative steps to adjust race ratios after complete implementation of the Middle School Plan, the school system will experience an increase in the number of racially identifiable schools, as well as, the magnitude of racial identifiability of each school.

To illustrate, Plaintiffs argue that, before the plan, there were six (6) schools that were 50% black or higher. (PX 1 at 15–16). Although the projections in the Middle School Plan anticipated a decrease to five (5) schools, the actual number had increased to twelve (12) by the fall of 1995. *Id.* There were nine (9) schools that were between 40 an 49% black before the plan was implemented. *Id.* According to Defendants' 1991 projections, there was supposed to be seven (7) schools that were between 40 and 49% black. *Id.* By the fall of 1995, there were only five (5) schools in this range. *Id.* However, overall, fifteen (15) schools were considered racially unbalanced before the plan; the 1991 projections predicted that the number would decrease to twelve (12). *Id.* Unfortunately, the number increased to seventeen (17). *Id.*

(iii) *Ex Parte Communications*

An unfortunate occurrence which may have contributed to Defendants' apathetic attitude over the past several years was that Defendants were given *ex parte* advice from the previously presiding judicial officer. Plaintiffs argue that, "[t]he testimony of Dr.

John Heur leads to further doubt about defendants' representations to this Court." (Pls.' Br. in Supp. of Pls. Objs. at 52). Plaintiffs explain that Dr. Heur served as the Director of Pupil Administrative Services for the Hillsborough County school system and was responsible for implementation of Defendants' desegregation plan, including participating in the submission of plans and annual reports to the Court. Dr. Heur testified that he had several *ex parte* conversations with the judge then presiding over this case, as well as, the presiding judge's law clerks. (T7 at 13–16).

Dr. Heur explained that most of the time he was asked to explain information included in the School Board's submissions to the Court. (T7 at 15). However, on one occasion, the presiding Judge told Dr. Heur that the schools could be "left alone" if the School Board had not been the cause of a deviation from the ideal race ratios stated in the 1971 desegregation Order. *Id.* at 16. Dr. Heur testified that, as a result of the *ex parte* conversation with the presiding judge, he understood it to mean that if the change in racial composition in a particular school was caused by housing patterns, rather than, gerrymandering done by the School Board, then the School Board was not obligated to make changes to that schools' attendance boundaries. *Id* at 17–18. Notwithstanding, Dr. Heur testified that the School Board, in fact, continued to adjust the race ratios if they deviated from the target ratios. *Id.* at 18.

The Magistrate Judge emphasized that, regardless of any ex parte advice that may have been given, Defendants continued to take steps to improve the racial balances when making boundary changes and opening and closing schools. (R & R at 85). The Magistrate Judge explained that, "[i]f this advice was indeed given, there is no inconsistency between the advice and the Court's Orders. These *ex parte* conversations, while unfortunate, were not initiated by defendants and do not demonstrate a lack of good faith on the part of defendants in complying with the Court's orders."

■ There is no dispute that the *ex parte* communications were inappropriate. However, standing alone, the *ex parte* communications do not evidence bad faith. Neverthe-

less, in light of the Court's findings, the communications may explain why Defendants failed to take affirmative action to desegregate the school system. Defendants have taken the position that, once the attendance zones were drawn and the schools reflected the system-wide racial composition, albeit for a brief period of time, the School Board had no further obligation to take affirmative steps to convert to a unitary system. This philosophy is clearly erroneous. Consequently, Defendants have failed to meet the Constitutional commands espoused in *Brown v. Board of Educ. of Topeka, Kan.*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and the Court will retain jurisdiction over the educational policies related to student assignments.

In order to fully apprise the parties of the posture of this case, the Court will address Plaintiffs objections to the Magistrate Judge's findings in connection with the remaining *Green* factors. The following factual findings are taken from the Magistrate Judge's Report and Recommendation: [38]

## FACULTY AND STAFF ASSIGNMENTS

1. For the 1993–1994 school year, 14% of the teachers in Hillsborough County were black. For the same year, blacks constituted 17% of the principals, 22.2% of the assistant principals, and 7.9% of the district administrators (at the main school board office). Of the noninstructional permanent personnel, 16.1% were black. Black teacher aides comprise 25.3% of the total teacher aides employed by the county.[39] (T2 at 132–135)

2. According to Marilyn Whittner, Director of Human Resources, the School Board has "a dearth of minority applicants for our teaching positions and we are constantly seeking minority teachers." (T2 at 105) The School Board focuses recruitment efforts at colleges with a substantial percentage of black graduates.

3. Additionally, a mentoring program has been instituted for black teachers who aspire to be administrators. More than one-half of the graduates of that program have been placed in administrative or teacher resource positions. (T2 at 108–09; PX 14)

4. For instructional and non-instructional personnel, the principal at an individual school interviews prospective applicants and is authorized to make offers contingent on approval by School Board and staff. Principals are given criteria for open positions. If Human Resources determines that a new hire would adversely affect the racial ratio at a particular school it will disapprove the offer unless no other qualified candidates are available. (T2 at 112–116)

5. Instructional personnel employed by the School Board are represented by a union which negotiates salaries based on the level of service and academic degree held by the employee. These salary levels are applied across-the-board to all teachers. (T2 at 114–15)

6. There are currently no schools in which black teachers or staff constitute a majority nor has that situation existed in the past since the 1971 Order was entered. (DX 7)

7. The parties' experts differ on whether some schools are racially identifiable due to their faculty and staff compositions. Using a 15% deviation standard, Dr. Stevens identified twelve elementary schools which are not in compliance with the district-wide ratio. However, Dr. Armor, Defendants' expert, did not find any schools which fit into this category. This is because Dr. Armor used only faculty data; Dr. Stevens used data from the annual reports which aggregate faculty and staff and include non-certified personnel. (T4 at 139) However, the 14% figure cited by Defendants referred only to black faculty, not staff. (T2 at 130, 132)

8. None of the Court's Orders have ever required the School Board to provide racial balance at the upper management level. However, Plaintiffs note the paucity of upper-level black administrators during the time the School Board has operated under court supervision. During this period, only one (1) of the six (6) Assistant Superintendent positions has been held by a black individual: Assistant Superintendent of Support Services. (T7 at 145–47)

---

**38.** *See* R & R (Docket No. 809) pgs. 34–57.

**39.** Defendants used district-wide employee data from the 1993–1994 school year at the unitary status hearing. (T2 at 134)

9. Defendants have never been found liable for racial discrimination in employment based on records which have been maintained since at least 1977. Some complaints have been resolved at the administrative stage. (T7 at 199–200)

10. The School Board has in place grievance procedures which can be utilized by parents and students as well as employees and includes various levels of review, including a public hearing before the School Board. Student handbooks distributed to every student at the start of the school year outline these procedures. (T7 at 201–04)

11. Dr. Samuel Horton, an educator with the School Board between 1977 and 1991, served as General Director of Secondary Education where he helped develop guidelines for the gifted program among other programs. He noted the absence of any blacks in assistant superintendent positions during that time. Dr. Horton, who is African-American, stated that he applied twice for the position of Assistant Superintendent for Instruction but was not selected either time. While he did not file a grievance, Dr. Horton testified that he believed he was not selected due to his race. (T6 at 88–96; 103)

12. Ann Porter, head of the Tampa branch of the NAACP, testified about concerns about black males being denied employment opportunities and other complaints she receives.[40] Ms. Porter, who is African-American, meets with the Superintendent and staff on the average of once or twice a month. This working relationship has become stronger with the current Superintendent, Dr. Earl Lennard. Although she is opposed to a declaration of unitary status at this time, Ms. Porter admitted that many complaints are resolved through these informal meetings. (T6 at 139–41)

## TRANSPORTATION

13. With regard to transportation of students, the School Board's obligation has been to insure that bus routes and assignment of students to buses "assures the transportation of all eligible students on a non-segregated and otherwise non-discriminatory basis" and to regularly re-examine its transportation system. (July 1971 Order at 10)

14. In 1996, the School Board transported approximately 80,000 students daily. It is the fifth largest school district in the nation in terms of the numbers of students transported. (T1 at 123) For the 1994–95 school year, the School Board received over $17 million in state funding for transportation. (DX 24)

15. As required by Florida law, any student attending a school two (2) or more miles from his residence must be furnished transportation by the school district. (DX 21) The School Board has always complied with this requirement. (T1 at 122–25)

16. The School Board provides transportation for all students who qualify and no distinctions are drawn as to race. (T1 at 131–33)

17. The desegregation technique adopted in the 1971 Order involved closing the formerly allblack schools and assigning them to "satellite" attendance zones. (T4 at 135–36)

18. The School Board has maintained data on the number of students transported annually and their race. For the 1995–96 school year, approximately 18,400 students were transported for desegregation purposes including students attending magnet schools. (PX 1 at 20)

19. Of this number, more black students than white students were transported at each of the three (3) school levels: elementary, middle, and high school. (PX 1 at 20)[41]

20. At no time after the 1971 Order was entered did Plaintiffs raise any objection about the number of students bused, including when the desegregation plan was modified in the 1991 Consent Order due to implementation of the Middle School Plan.

40. Ms. Porter was not asked about a venture between the University of South Florida and the School Board launched in August 1995 to place black male teachers with the School Board after graduation. (DX 14, "Project PILOT" documents)

41. Of the elementary students transported 23% were black and 10% were white. At the middle school level 26% were black and 18% were white. Of the high school students, 24% were black and 8% were white. (PX 1 at 20)

21. Part of the reason for adopting the Middle School Plan was to allow students to attend schools close to their homes as much as possible. (T1 at 65)

22. Although the 1971 Order did not require provision of transportation for after-school activities, the School Board provides "activity buses" for after-school activities to afford students living in satellite areas (a non-contiguous attendance zone area) the opportunity to participate in those activities if they were not able to provide their own transportation. Because the junior high schools are being phased into middle schools which are "self-contained" in their activities, the activity buses are primarily used at the high schools. (T1 at 123–30) Activity buses are provided for any students who need to stay after school for any reason, and are not limited to athletics or clubs. (T1 at 138–41)

23. In 1989, the School Board examined whether providing only one (1) activity bus per satellite area met the needs of the students. The Superintendent and his staff determined that more than one (1) activity bus per school might be needed on certain days due to the number of activities and events scheduled at the schools. (DX 23)

24. This policy was implemented and remains in effect today. The School Board supervisor of transportation surveys schools on a weekly or daily basis to determine the number of buses needed. (T 131–36; 138–41)

**EXTRACURRICULAR ACTIVITIES**

25. Under this Court's desegregation plan the School Board has been ordered to regularly re-examine its extracurricular activities to insure that they are maintained and operated on a non-segregated and non-discriminatory basis. (July 1971 Order at 10)

26. In the fall of 1971, the Hillsborough County school system was integrated in its athletic programs and all students, regardless of race, were given an equal opportunity to participate in athletics. (T1 at 112–13)

27. Since that time, a committee composed of the athletic director and assistant school principals has regularly reviewed proposed changes in the athletic programs pursuant to policies adopted by the School Board. The School Board offers a number of athletic programs, ten (10) for females and ten (10) for males. (T1 at 113–15)

28. Athletic activities are offered at each senior high school and existing junior high school. They have been eliminated at the middle schools as part of the restructuring program and due to funding. The director of athletics hopes to provide athletic programs at the middle schools in the future. (T1 at 114–15; 119–20)

29. Of total student participation in athletics, approximately 23% of the athletes were black and approximately 77% were white for the school year 1996–1997. Participation varied from school to school and sport to sport. For example, total participation in basketball for black students was 54% (males) and 49% (females). On the other hand, participation by blacks on high school swim teams was very low. Only three (3) black students (1 female, and 2 males) participated on high school swim teams. Over 18% of the cheerleaders were black. (DX 28; T1 at 115–19)

30. The School Board also offers a variety of other extracurricular activities at senior high schools, including: drama, choral program, string and instrumental music programs, honor clubs, service clubs and various interest clubs. (T2 at 127–28)

31. Defendants do not maintain data on a school by school basis for extracurricular activities but do track overall participation by race. In 1995, black students accounted for 11% of the honor society memberships, 12% of drama clubs, 27% of student councils, 20% of marching bands, 14% of orchestras, and 19% of choral groups. (PX 1 at 27)

32. These activities are open to all students and no students are denied the opportunity to participate because of their race.[42]

---

42. Mae King, mother of an Armwood High School student, testified that she observed cheerleading try-outs at Armwood recently because she was concerned that there were not enough black cheerleaders. As a result of the try-outs,· however, three (3) blacks were chosen for the varsity squad and three (3) were chosen for the junior squad. (T4 at 17–27) Ms. King also recounted an incident where a suggestion was

## FACILITIES AND RESOURCE ALLOCATION

### Site Selection and School Openings and Closings

33. The School Board's duty as to facilities under this Court's Order is the same as with transportation and extracurricular activities. As required by prior orders of the Court, the School Board was to make sure that school construction, school consolidation and site selection (including the location of any temporary classrooms) would be "done in a manner which will prevent the recurrence of the dual school structure." (July 1971 Order at 11).

34. The School Board has reported to this Court the opening and closing of schools and the impact of these actions on the race ratios at the schools. (T1 at 24) It has also presented proposed plans to the Bi-Racial Committee for input. (T1 at 64)

35. Between 1971 and 1993 the School Board has constructed 25 new schools. In most cases, the percentage of black students attending these schools the first year was brought closer to the 80/20 ratio. (DX 4)[43] By 1995, five additional schools were built. (PX 1 at 8) None of the new schools has been opened with an all-white population or a black population of close to 40 percent. (T1 at 26)

36. As a general rule, the School Board has approved construction of new schools in areas of increasing population growth and where the greatest amount of overcrowding exists. (T1 at 25) During the past twenty-five (25) years, most new schools have been opened in the suburbs. In every case of a new school opening, the School Board has taken into account the projected race ratios at the new schools and assigned satellite attendance areas if necessary to maintain a racial balance at those schools. (T1 at 33) Especially with the elementary schools, the School Board tried to assign students to a school near their residence so they could walk to school. (T1 at 43)

made at a PTA meeting to have a black disc jockey at a school dance and some of the people at the meeting got upset and walked out. (T4 at 20-21; 27-28)

37. A total of nine (9) schools have been closed since the 1971-1972 school year. (DX 5) When those schools were closed, the School Board took into account the race ratios at the closed school and the schools to which the pupils were reassigned. (T1 at 30-31) In most cases, the closing of the schools brought the schools the students were reassigned to closer to the 80/20 ratio. (DX 5)

38. Plaintiffs have been notified of all school construction through the reports filed with the Court as to boundary changes. Plaintiffs have never objected to the location of new schools. Although most of the new schools have been opened in the suburbs, Blake High School, which is a magnet high school opened in the 1997-1998 school year near downtown Tampa. Defendants have also opened several magnet schools in predominantly black, inner-city areas: Lee, Phillip Shore, and Dunbar Elementary Schools, as well as, Young and Middleton Middle Schools. (T1 at 155; 174-177)

### Overcrowding

39. During the past ten (10) to twelve (12) years, overcrowding has become a problem for most Hillsborough County schools and double sessions a reality at some. (T1 at 61)

40. Plaintiffs introduced evidence that the schools having a black student enrollment of 40% or more are more likely to be overcrowded in terms of their Florida Inventory of School Houses (FISH) capacity. Plaintiffs' demographics expert, Dr. Shelley, testified that schools with a 40% or more black enrollment are more likely to have enrollments significantly over their FISH capacities than schools which are racially balanced. (T4 at 37; PX 2 at 11-13, 22-23)

41. Dr. Shelley's data also shows that in 1995, a total of 102 public schools in Hillsborough County were more than 25% over their FISH capacity: eighty-eight (88) were racially balanced schools and fourteen (14) were unbalanced[44] schools. Only eight (8) of the

43. The School Board's exhibit does not address schools opened after the 1993 school year.

44. Dr. Shelley used the same measure of racial imbalance used by Dr. Armor and Dr. Stevens.

eighty-eight (88) balanced schools were more than 50% over their FISH capacity but four (4) of the fourteen (14) unbalanced schools fell into this category. (PX 2 at 23)

42. However, the FISH capacity of a school does not include portable classrooms. Use of portables does not necessarily mean that a school is overcrowded. (T4 at 101–03) [45]

43. Some classes, particularly those which are federally funded, provide an opportunity for a lower pupil to teacher ratio. Thus, a classroom built for twenty-five (25) or thirty (30) children may hold only twenty (20) children. (T1 at 63–64) Most, if not all, of the sixteen (16) schools with black student enrollments of 40% or more are included in the sixty-one (61) "Title 1" schools in Hillsborough County which received additional funding per pupil for the 1996–1997 school year. (DX 37)

44. The School Board recognizes that overcrowding is a serious problem and that the entire community is concerned about it. Last year, voters approved a sales tax increase. Moreover, the School Board appointed an Overcrowded Schools Task Force. The Superintendent and his staff compiled data for all Hillsborough County public schools including FISH capacity, number of portables, as well as the acreage of each school site. The Percentage of Capacity Report (DX 32) generated for the Task Force and the School Board is being used to determine what measures need to be taken to relieve overcrowding. (T7 at 222–24)

45. Although no testimony was provided interpreting the Percentage of Capacity Report in terms of individual schools, it appears that of the 105 elementary schools surveyed, the ten (10) elementary schools with the highest number of points include Edison, Witter, DeSoto, Shaw and Cleveland, all of which have black student enrollments of 40% or more. (DX 32, Elementary Schools, at 1)

### Teacher Resources

46. For the 1992–1993 and 1994–1995 school years, schools with a black student enrollment of 40% or more had a lower teacher-student ratio than the other schools with fewer than 40% black students. (DX 1, charts 33 and 36)

47. For this two-year period, there was also no discernable difference in terms of educational degrees and experience between the teachers at the over 40% schools and those which were under 40% in terms of black student enrollment. (DX 1, charts 33–36)

### Expenditures

48. In 1995, the School Board had a budget of $1.2 billion. (T7 at 150)

49. Funding is received from three (3) separate sources: federal, state, and local. Funds for operating expenses come from the Florida Educational Finance Program (FEFP), a state program that funds school districts based on the needs of students and the costs to provide education in the school district as opposed to other Florida school districts. The FEFP funds come from three (3) sources: state revenue based on sales tax, local property tax revenue, and revenue from the state lottery. (T1 at 185–88)

50. The School Board also receives funding from the federal government for educating handicapped students and funding based on the socioeconomic needs of the students. Capital outlay expenses for new schools and other capital expenses come from local taxes. The School Board also receives some state funds generated from gross receipts on utilities. (T1 at 188)

51. Various agencies of the federal and state government regularly audit the School Board to insure expenses meet the program requirements and that funds are allocated on an equitable basis. (T1 at 190–91; 195–97)

52. There is no difference in the per capita expenditures of the School Board on instructional salaries for teachers district-wide regardless of the racial composition of the schools. (DX 1, charts 37, 40) As stated in the preceding discussion of faculty and staff, instructional salaries are set by the collective bargaining agreement between the teacher's

---

**45.** Defendants have provided a 46–page list entitled "Relocatable Classroom Inventory" which listing all portable classrooms placed in use between 1949 and 1995 and their locations. (DX 29)

association and the School Board. The federal government also prescribes comparability standards for employees paid by federal funds. (T1 at 199)

53. Funding for instructional resources is allocated by the School Board on a pupil by pupil basis without regard to race, ethnicity, gender, or other limits such as the FISH capacity for the school. When a group of schools is converted to the middle school plan, those schools receive additional resources due to the conversion. (T7 at 191–93)

54. A comparison of expenditures for instructional supplies and equipment for fiscal years 1993 and 1995 showed that elementary and junior high schools which were more than 40% black received slightly less funding than schools which were less than 40% black. (DX 1, charts 38 and 41)

55. The School Board attributes this difference to "conversion funds distributed to schools which were newly constructed or reconfigured pursuant to the Middle School Plan" and notes that "[m]ost of the over 40% schools [are] not scheduled for conversion until the 1996–1997 and 1997–1998 school years." (Dkt. 797 at 83) The record supports this argument. (T1 at 97)

56. In addition, a study of total capital expenditures for fiscal years 1993 and 1995 indicates that there was essentially no difference between schools which were over or under 40% black. During the latter year, elementary schools which were over 40% black received more funding. (DX 1, charts 39 and 42)

57. A review of capital expenditures during the period 1991 to 1995 by Dr. Armor revealed that expenditures for inner city elementary schools (which comprise most if not all of the more than 40% black schools) were slightly higher than those of the other elementary schools.[46] Spending for the inner city junior high schools was substantially higher than other junior high schools. (DX 1, chart 43)

## QUALITY OF EDUCATION

58. Several witnesses called by Plaintiffs, including Plaintiff Andrew Manning and School Board Chair Doris Reddick, testified poignantly about the differences between black and white schools in the era of *de jure* segregation. Mr. Manning and Ms. Reddick attended public schools in Hillsborough County. Ms. Joanna Tokley taught in the public schools, both before and after the Court's 1971 desegregation order. All three (3) are African–American. (T3 at 163–68; T5 at 20–23; T6 at 103–110)

59. Orders entered in this case have not required the School Board, in dismantling the dual school system, to attain specified levels of student achievement or any other standard to evaluate quality of education. However, this Court's referral order directed that the quality of education, along with the other *Green* factors be evaluated, as well as, the School Board's good-faith commitment in determining whether the public schools of Hillsborough County have attained unitary status.

60. Evidence presented by the parties concerning the quality of education today focused on academic achievement, enrollment in gifted programs, and suspension and dropout rates. Other factors bearing on quality of education such as facilities and resources as well as magnet programs have been addressed in the preceding sections.

### Achievement Tests

61. Since 1977, the School Board has examined the results of achievement tests by students of different races on a regular basis. (T2 at 147)

62. Dr. John Hilderbrand, who has supervised testing for the Hillsborough County school system since about 1977, testified that there are an increasing number of state-mandated tests for students that are admin-

---

**46.** Darrell Daniels, one of the witnesses called by Plaintiffs, is employed with the Urban League and operates youth development programs at Robles and thirty-one (31) other schools. One (1) of his children attends Robles. While commending the principal of Robles, Mr. Daniels, who is African American, criticized the lack of commitment to education which he saw in the other personnel at the school. He also felt that Robles did not have the equipment such as computers which other schools have. However, he agreed that a school's commitment to education can vary regardless of the racial make-up of the school. (T6 at 58–77)

istered and evaluated by the School Board. (T2 at 138–40)

63. On the Stanford Achievement Test, Hillsborough County students scored slightly below the 50th percentile in reading and slightly above the 50th percentile in math and language which is the average rank for a national population. (T2 at 139–140) A standardized writing exam given to students in the fourth, eighth and tenth grades demonstrates that Hillsborough County students score higher than any of the other large school districts in the state. (T 2 at 140) Similar results are obtained on the High School Competency Test (HSCT). (T2 at 141) Scores for black students on the writing exam and HSCT show that Hillsborough County students outperform state averages for those tests. (T2 at 141)

64. A voluntary test taken by about 47% of seniors in high school—the Scholastic Assessment Test—has consistently produced results that place Hillsborough County students above national and state averages. When the scores are analyzed by race, the same result is shown. Black students in Hillsborough County outperform state and national norms. (T2 at 141)

65. In attempting to evaluate how well the school system is educating all of its students, Dr. Armor examined standardized tests (the Stanford Achievement Test) given to fifth grade students in Hillsborough County in the spring of 1994 and the spring of 1995. Overall, black students scored sixteen (16) to seventeen (17) points lower than white students in reading and math. (T3 at 88–89; DX 1, chart 44) This represents approximately three-fourths of a standard deviation. (DX 1 at 21)

66. A nationwide study conducted in 1992 found that similar differences exist between blacks and whites at all grade levels in math and reading; the achievement gap ranges from two-thirds to four-fifths of a standard deviation depending on the grade and test level. (DX 1 at 21)

67. However, when performing a regression analysis which used socioeconomic fac-

tors relating to family income, single or two parent families, and the educational background of the parents, the gap in scores between black and white students narrows considerably. (T3 at 90–101; DX 1, chart 45) Dr. Armor concluded that about 60% of the gap in the reading scores for black and white students and about 66% of the math scores can be explained by socioeconomic factors. (DX 1, chart 46)

68. Additionally, when the first grade test scores for the same group of students are added as an additional variable, almost 75% of the reading gap and 90% of the math gap is explained by these variables.[47] (DX 1 at 22–23, chart 47)

69. An analysis of Stanford Achievement Tests taken by eighth grade students revealed similar results. About 71–72% of the gap in reading scores and about 84–86% of the gap in math scores between black and white students in Hillsborough County for the same years was attributable to a combination of socioeconomic factors and first grade test scores. (DX 1 at 23, charts 48 and 49; T4 at 98–100)

70. Dr. Robert Crain, a witness called by plaintiffs, criticized some of the assumptions and methodology employed by Dr. Armor in arriving at his conclusions. (T6 at 157–207)

71. Dr. Crain disagreed with Dr. Armor's use of first grade test scores as predictors of student achievement entering first grade because the tests are given in the spring rather than in the fall. (T6 at 162–63) However, Dr. Crain agreed that a student's entry-level skills are important predictors of how well a student will perform on the fourth and eighth grade tests. (T6 at 253–53)

72. Dr. Crain also disagreed with Dr. Armor's use of neighborhood data to determine the variables of family income and educational level of parents because that data reflected averages rather than actual figures for a neighborhood and therefore would presumably include both black and white families. (T6 at 168–73; 236) However, Dr. Crain uses neighborhood income in the studies he con-

---

**47.** First grade test scores are used as a predictor of student achievement or skills before entering school. (T3 at 96) However, the tests are given in the spring of the school year rather than the

fall and therefore are the product of the first grade curriculum to an extent. (T6 at 253; 283; T7 at 186–87)

ducts. (T6 at 236) Dr. Crain also questioned whether family income and educational background could be remnants of the prior segregated school system. (T6 at 174–76)

73. Overall, Dr. Crain thought that Dr. Armor had overestimated the effects of socioeconomic factors on achievement test scores. (T6 at 192) Although he disagreed with some variables used by Dr. Armor, Dr. Crain did agree that the socioeconomic factors of free lunch and the number of parents at home were relevant and important variables. (T6 at 266) Using these factors, he obtained a line of regression similar to Dr. Armor's study. Dr. Crain did not determine the statistical significance of the differences between his study and Dr. Armor's (T6 at 270) [48]

74. Dr. Crain's study showed that fifth-grade black students attending schools that were at least 40% black performed deficiently when compared with their counterparts attending schools that were under 40% black. (T6 at 206–07) However, these differences occurred only with reading. There were no differences in math. (T6 at 281–82)

75. However, when Dr. Crain used the same variables as Dr. Armor, he reached substantially the same results. (T6 at 265–66)

### Academic Outcome

76. To evaluate how well the school system is doing in educating high school students, Dr. Armor examined grade averages and college plans as no standardized tests are taken by twelfth graders. White students have a 2.9 grade average; black students have a 2.3 grade average. Fifty-six (56) percent of the high school seniors who were white planned to attend college as compared to 45% of black students. (DX 1 at 24–25, chart 54)

77. When adjustment is made for socioeconomic factors and tenth grade achievement tests, Dr. Armor concluded that the grade average gap for black and white seniors would be only about .15 grade point. (DX 1 at 25, chart 55) After adjusting for socioeconomic factors, the difference between black seniors and white seniors in terms of college plans is practically negligible. (DX 1 at 25, chart 55)

### Gifted Programs

78. As of October 1996, approximately 75% of the students enrolled in Hillsborough County gifted programs were white and approximately 9% were black. The remaining 16% were from other minority groups: 11% Hispanic, 4% Asian, and Indian and multicultural, less than 1% each. (T2 at 151–52) While the number of black students in the gifted program is disproportionate to the number of black students enrolled in public schools, students must both apply to the gifted program and meet minimum criteria including attainment of a minimum score on a standardized test.

79. Until 1991, admission into gifted programs was set by state standards requiring an IQ test of 130 or higher. That year, the state adopted a plan to increase the number of minority gifted students and invited school districts to submit alternate criteria for admission. Hillsborough County elected to participate and submitted criteria under this program (referred to as "Plan B") which included an IQ score of 115 or higher together with demonstrated academic achievement and other characteristics typical of gifted individuals. (T 153–56)

80. Implemented in 1993, the "Plan B" program continues to this day. Dr. Stevens noted that the school district's implementation of "Plan B" had increased the proportion of black pupils in the gifted program. (PX 1 at 31)

81. Ronnie King, number two (2) in his class at Armwood High School, moved to Tampa from Colorado. He had been enrolled in gifted programs in Colorado. He

---

**48.** Dr. Crain disagreed with Dr. Armor's use of a "two-tailed" statistical model and felt that he should have used a "single-tailed" analysis. (T6 at 274) His preference for the single-tailed analysis was that "no one ... would expect blacks to score better in higher black schools." (T6 at 274) The reasons cited by Dr. Armor for use of the two-tailed analysis are more persuasive and refute Dr. Crain's assumption that black students in schools with a higher black enrollment will always score lower than those students in schools with a lower black enrollment. (T7 at 161–69)

missed a year of participation in gifted programs in seventh grade due to the transfer and having to be retested. His mother was later told that he did not need to be retested. Mr. King, who is African–American, was placed in gifted programs in the eighth grade and has participated in those programs since that time. (T6 at 43–55).

### Dropout Rates

82. Defendants monitor dropout rates and have a program designed to minimize dropouts. In the elementary schools, the program relies on enhancing reading, math, and skills development in small groups of students. (T7 at 206–07)

83. In the junior and middle schools, the School Board focuses on students who may be at risk of dropping out and provides those students with additional academic experiences with a low teacher to student ratio. At the senior high schools, defendants provide additional counselors and teachers in a graduation enhancement program. (T7 at 207)

84. Additionally, the School Board provides a monthly report of prospective dropouts to the principals of each school. The principals are expected to follow-up with each student on an individual basis to give specific suggestions on how to stay in school or participate in alternate programs such as the GED program or adult education which meets the needs of the student. (T7 at 207)

85. The dropout rates for Hillsborough County public schools are the lowest in the state for similar large urban school districts. In the past five (5) years, dropout rates have averaged about 3 ½%. (T7 at 208–09)

86. Dr. Armor examined data for the high school graduating class of 1995 beginning when those graduates were in the eighth grade. The difference in dropout rates for blacks (15%) and whites (9%) is not significant. When adjusted for socioeconomic factors, that difference is negligible. (DX 1 at 24, charts 52, 53)

### Suspension Policies and Rates

87. The School Board also tracks suspensions and expulsions by sex, race, and age. The suspension rates for Hillsborough County are lower than state-wide averages in some areas and for some groups. (T7 at 234)

The School District has out-of-school suspension programs as well as seven (7) alternative school sites. Individual schools can elect to run an in-school suspension program; that decision is left up to the administration at each school. (T7 at 234–36)

88. Dr. Armor did not examine suspension rates, but Dr. Stevens did. After examining four (4) years of data (1990–1994), Dr. Stevens concluded that black students are suspended from school at disproportionately high rates. He found that in 1994–1995 the suspension rate for black students was two (2) to four (4) times higher than the rate for white students depending upon grade level and the type of suspension. This data did not lead Dr. Stevens to infer racial discrimination, however. His criticism was that the School Board had not examined this data more closely on a school-by-school basis "to verify that disparities are not race-related." (PX 1 at 29–30)

### B. Faculty and Staff Assignments

Plaintiffs object to the Magistrate Judge's Recommendation that unitary status be declared with regards to faculty and staff assignments. Plaintiffs point out that the Court's July 2, 1971, Order provides:

> Principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for black students or white students. Such personnel shall be assigned so that the ratio of black to white teachers in each school, and ratio of other staff in each are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

(July 2, 1971, Order at 10). Plaintiffs argue that the Order specifically contemplates the inclusion of faculty and staff in the analysis and staff assignment is expressly listed as a *Green* factor. Plaintiffs assert that the evidence on staff which the Magistrate Judge deemed unreliable is a critical component of desegregation orders in general, and particularly, to the desegregation Order in this case.

Plaintiffs argue that, without exception, schools with higher percentages of black fac-

ulty and staff, fall into one (1) of three (3) categories: (1) a high percentage of black student enrollment, (2) a historically black school prior to the 1971 Order, or (3) a school located in the inner city. *See* (PX 1i (Appendix to Pls. Proposed Findings of Fact and Conclusions of Law)). Plaintiffs emphasize that the schools deviate 10% or more from the district-wide faculty and staff average and many deviate by 15% or more.

Conversely, Defendants argue that the Court's 1971 desegregation Order, which dealt exclusively with student assignment, did not treat faculty and staff. Moreover, Defendants argue that when the Court ordered that, "[p]rincipals, teachers, teacher-aides and other staff ... be assigned so that the ratio of black to white teachers in each school, and the ratio of other staff in each are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system," the Court failed to provide a specific statistical variance which was to be used in assessing compliance with its directives. Defendants point out that, in the July 2, 1971, Order, the Court acknowledged that faculty desegregation had been accomplished in the 1970 school year and declined to continue the "detailed procedure" requested by Plaintiffs. (July 2, 1971, Order at 8). Nevertheless, the Court continued the requirement for faculty desegregation.

Defendants explain that they do not maintain data on faculty and staff broken down by certificated (teachers and other instructional staff) and non-certificated (aides) employees. Defendants assert that the collection of data in this manner is entirely consistent with the Court's previous orders, which dealt with all "staff" who "work directly with children." Moreover, Defendants contend that, although the Court required that Defendants maintain faculties at each school which reflect the system-wide employment ratios and did not provide any specific level of hiring black teachers since the entry of the Court's 1971 Order, Defendants have attempted to meet a "self-imposed" goal of faculties which are 80% white and 20% black to reflect the system-wide race ratio of students in the system. (T2 at 106). Defendants admit that they have never met this goal; however, Defendants assert that they have made, and continue to make, efforts to meet the 20% goal.

The Court finds that Defendants have been complying in good faith with the Court's Orders and Defendants should continue their efforts until unitary status is declared. Among Defendants affirmative efforts are the adoption of the recommendations of the Minority Recruitment Task Force with regards to strategies and activities directed towards increasing the number of black teachers and administrators in the school system. (T2 at 107). Defendants have employed aggressive minority recruitment techniques which have been successful. *Id.* at 105–06. Defendants have also imposed certain restrictions on schools having less than 20% black faculties. For instance, the School Board prevents black teachers from moving away from a certain school when that teacher's presence is needed to maintain racial balance. In addition, the School Board prohibits a principal from hiring a white teacher at the imbalanced schools unless there are no suitable black candidates. (T2 at 115). The School Board imposes similar restrictions on black and white teachers with regards to transfers and reassignments. The School Board has been making administrative decisions solely based on the racial balance of the transferring and receiving schools.

Despite the inability of the parties to agree on a standard on which to base compliance, the Court finds that Defendants' 15% variance is useful. Although the Court commends Defendants efforts in this area, Defendants shall include staff assignments in their subsequent evaluations and provide evidence in this regard when unitary status is sought in the future. Moreover, the parties shall confer and endeavor to agree on a measurement to be used in subsequent submissions to the Court. Plaintiffs' objections to the Magistrate Judge's findings are overruled in all other respects.

### C. Transportation

Plaintiffs object to the Magistrate Judge's findings concerning transportation of students in Hillsborough County because black students bear a disproportionate burden. Plaintiffs contend that, at the elementary

school level, 23% of all black students and 10% of all white students are transported for desegregation purposes. (PX 1 at 20; PX 1f). At the middle school level, 26% of all black students and 18% of all white students of all white students are transported for desegregation purposes. *Id.* At the high school level, 24% of all black students and 8% of all white students are transported for desegregation purposes. *Id.* However, Plaintiffs concede that, to the extent busing is considered a burden on the student, these figures overstate the number of students bused for desegregation purposes because the figures include students who attend magnet schools and do so voluntarily. Nevertheless, Plaintiffs point out that black students are still more likely than whites to be assigned to a bus for desegregation purposes.

Plaintiffs argue that the issue of busing is directly linked to Defendants' student assignment and site selection policies. Particularly, Plaintiffs argue that, the perpetuation of the satellite program places a disproportionate transportation burden on black students who live in the satellite areas. Moreover, Plaintiffs argue that the students who are bussed may be disadvantaged in terms of participation in extracurricular activities.

Conversely, Defendants argue that, in *Mannings v. Board of Public Instruction,* 427 F.2d 874 (5th Cir.1970) ("*Mannings III*"), the Fifth Circuit found that the transportation system in Hillsborough County had been desegregated by this Court's May 15, 1967, Order. *Id.* at 876. The Circuit Court directed this Court to supplement that earlier decree to include the specific requirements of *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969). In *Singleton,* the Fifth Circuit required school districts subject to desegregation orders to regularly re-examine their transportation systems to insure the provision of such services in a "non-segregated and otherwise non-discriminatory fashion." *Id.* at 1218. This Court included this *Singleton* requirement in its July 2, 1971, Order.

Defendants point out that, despite the requirement of a non-discriminatory system,

the Court did not impose any obligations on Defendants to monitor or ameliorate any busing "burden." Defendants emphasize that the desegregation plan actually imposed a greater transportation burden on black students because black schools were ordered closed or converted and by necessity, those children had to be transported elsewhere.

Plaintiffs raised this issue when Defendants initially proposed the desegregation plan and the Court addressed Plaintiffs' concerns. In the July 2, 1971, Order, the Court explained that implementing the desegregation plan would likely result in disproportionate busing of black students. However, the Court noted that, although proportionately more black students would be bused, the plan would result in the busing of fewer students overall, and that the alternative to the plan—maintaining the formerly black schools—would require the transportation of large numbers of white students, with the possible result of " 'white flight' or 'black flight' or both."

 The Court's orders have not been amended to deal with disproportionate burden on black students and Defendants cannot be charged with a duty that has never existed. Moreover, Plaintiffs agreed to the continuation of the transportation burden in the 1991 Consent Order. It would be unfair to require Defendants to monitor and /or account for the respective burdens associated with the transportation of students when such requirement was not a part of the desegregation order or subsequent orders. Furthermore, because Defendants must take whatever steps are necessary to affirmatively desegregate the schools to the maximum extent possible until unitary status is declared, specifically with regards to student assignments, the disproportionate burden will continue. Defendants shall continue to provide transportation on a non-discriminatory basis. Nevertheless, Defendants should continue to consider the burdens imposed by transporting all students when decisions are made regarding student assignments and site selection.[49] Plaintiffs' objections to the Magis-

---

**49.** Defendants must remain cognizant of the correlation between site selection and the burden imposed on black students. While Defendants have noted the intention to reduce busing, if not enough facilities are being built in the inner-cities, black children, in particular, will require continued busing. These types of choices should be discussed openly between the parties.

trate Judge's findings with regards to transportation are overruled.

## D. Extracurricular Activities

Plaintiffs also object to the Magistrate Judge's finding that extracurricular activities provided in the Hillsborough County school system are unitary. Primarily, Plaintiffs complain that Defendants fail to collect and maintain data as to each school in the system. Plaintiffs argue that, because Defendants have only provided evidence regarding athletics as opposed to all of the various other activities, there is insufficient information upon which to make a determination of unitary status.

There is no dispute that the Court did not impose any numerical or other requirements by race in connection with the participation of extracurricular activities. (T4 at 166–67). Defendants assert that, although they do not maintain data reflecting extracurricular participation by race by school, they do track participation in the district overall. The data compiled for 1995 reveals that black students made up 11% of the membership of national honor societies, 12% of drama clubs, 27% of student councils, 20% of marching bands, 21% of other bands, 14% of orchestras, and 19% of choral groups. (PX 1 at 27). The Court agrees with the Magistrate Judge that Defendants offer and maintain extracurricular activities on a non-segregated and otherwise nondiscriminatory basis. However, as Defendants aggressively employ desegregation techniques over the next few years, the Court expects that the representation of minorities in these various activities will continue to improve.

## E. Resource Allocation

Plaintiffs argue that, overall, the data on resource allocation is so deficient that it is of little probative value. Plaintiffs assert that the data suffers from three (3) major deficiencies: (1) none of the data provided hereto is compared with information prior to the issuance of the 1971 Order; (2) only two (2) years of data are provided and not consecutive years; and (3) the analysis does not take into consideration the impact of the Middle School Plan. Plaintiffs argue that a comparison of resources allocated prior to 1971 is necessary in order to properly evaluate the prior *de jure* segregated school system and the vestiges of that system that remains today. Moreover, Plaintiffs argue that two (2) years of data does not provide sufficient reliable information to evaluate. Finally, Plaintiffs contend that, because the Middle School Plan involves a tremendous overhaul of the entire school system, the two (2) years of data used by Defendants is unreliable.

In addition, Plaintiffs argue that the teachers' resource information does not convey an accurate picture. Plaintiffs point out that the teachers' resource information includes resources, provided as a result of Chapter I funds. Chapter I funds provide significant resources based on the socioeconomic status of the students. (T7 at 93–95). As a result, Plaintiffs argue that, the inclusion of these Chapter I funds without indicating how this support affects the amount of resources can be misleading. Therefore, according to Plaintiffs, this is not a reliable indicator of how the school district actually distributes its resources.

Furthermore, Plaintiffs explain that the operational analysis includes information on teacher salaries and benefits, textbooks, instructional equipment, maintenance, and other categories. *See* (DX1 at 16–19). However, Plaintiffs assert that, because only two (2) years of data were provided, a dozen schools were excluded from the analysis on supplies and equipment expenditures. As a result, Plaintiffs assert that Defendants' data is unreliable.

Conversely, Defendants argue that the analysis provided by Dr. Armor is sufficient. Dr. Armor compared the allocation of teacher resources between schools having black enrollments greater than 40% and schools having black enrollments less than 40%. Defendants explain that the availability and distribution of funds is controlled to a large extent by state law and/or administrative regulation. The funds needed to operate the schools come from three (3) sources: (1) the federal government; (2) the State of Florida; and (3) local revenues. Defendants contend that, with regards to operations, the state money received by Defendants is distributed according to a weighted formula based on the numbers and educational types of students

enrolled during a given fiscal year. (T1 at 186). Defendants emphasize that both the state and federal governments audit Defendants to ensure that funds provided to the Hillsborough County schools are expended for the activities and programs for which they are provided and on an equitable basis. (T1 at 190–91; 195–96).

Defendants point out that the sample which was used demonstrates that the allocation of resources and expenditures was comparable for all schools regardless of whether the school was greater than or less than 40% black. With regards to teacher resources, Dr. Armor focused on expenditures for instructional salaries, instructional supplies, and for all purposes. (DX1 at 16–19). In the 1992–1993 school year, per capita expenditures for instructional salaries for elementary schools which had black enrollments in excess of 40% were slightly lower than expenditures for other schools. However, these expenditures were slightly higher for junior high schools which had black enrollments of 40% or higher. (DX1, Chart 37). For the 1994–1995 school year, the expenditures were slightly higher at schools with black enrollments below 40% than schools with black enrollments exceeding 40%; however, the differences were not remarkable. (DX1, Chart 40).

In the area of expenditures for instructional supplies and equipment, the evidence showed that these expenditures were slightly higher for elementary and junior high schools with black enrollments below 40% for both years examined. (DX1, Charts 38, 41). Defendants maintain that these differences were attributed to conversion funds distributed to schools which were newly constructed or reconfigured pursuant to the Middle School Plan. Defendants assert that most schools with 40% or more black enrollments were not scheduled for conversion until the 1996–1997 and 1997–1998 school years; therefore, the amounts distributed will be similar upon their conversion.

Moreover, according to Defendants, all of the resources with regards to instructional supplies and equipment are distributed on a per pupil basis to all schools, based on programmatic needs. (T7 at 192–95). Defendants explain that the only exception to this method of distribution is that schools which are converted to different grade configurations pursuant to the Middle School Plan are afforded additional monies, which while computed on a per pupil basis, are only available to those schools undergoing conversion. (T7 193–94).

Furthermore, with regards to total per capita expenditures, Defendants' analysis showed that in the 1992–1993 school year, the expenditures were very similar for elementary schools, regardless of racial composition, and expenditures were higher in the junior high schools which were 40% or more black. (DX 1, Chart 39). In the 1993–1994 school year, elementary schools that were over 40% black received higher per capita distributions, while junior high schools were nearly identical, regardless of racial compositions. (DX1, Chart 42).

Dr. Armor also reviewed capital expenditures on a five (5) year basis (1991 to 1995) because capital expenditures are "one-time costs, spread over two or more years." (DX 1 at 19). The expenditures were examined on a per school basis, comparing expenditures on inner city schools, which were comprised of the highest concentration of black students, with other schools. The analysis demonstrated that expenditures on inner city schools exceeded those on other schools. (DX 1, Chart 43).

Furthermore, Defendants explained that in addition to monies received from state and local sources, schools having certain levels of students receiving free and reduced lunches are eligible for federal monies, which may be used only at qualifying schools. (T7 at 93–96); (DX 37); (T1 at 190–91). These qualifying schools include many of the over 40% black schools. Defendants stress that this additional money is used to reduce class sizes and/or provide additional social and psychological services, as determined by the individual schools. (T7 at 95).

Defendants' distribution of teacher and financial resources reveals no pattern of discrimination and Plaintiffs' objections are overruled thereto. However, as the School Board continues to implement the Middle School Plan and to make adjustments pursuant to this Order, the School Board shall continue to evaluate its resource allocations.

Moreover, the School Board should provide Plaintiffs with records of resource allocations for each year following this Order until unitary status is declared. The parties shall confer and attempt to agree on the substance and format of those records.

### F. Facilities

Plaintiffs object to the Magistrate Judge's determination that the school system is unitary with respect to facilities. Plaintiffs assert that "[D]efendants' site selection policies and practices suggest that the placement and construction of new facilities have exacerbated racial identifiability." (Br. in Supp. of Pls.' Obj. to R & R at 32). Plaintiffs contend that Defendants failed to provide any documentation concerning: (1) the reasons a particular school site was selected; (2) a summary analysis of the impact of a selected site on desegregation; (3) alternative sites which were considered and rejected; and (4) the reason for rejecting an alternative site, including consideration of the alternative sites' impact on desegregation.

Plaintiffs contend that it is clear from Defendants' own data that they did not address racial identifiability when schools were opened and closed. For example, Plaintiffs point out that, from 1977 through 1995, twenty-four (24) elementary schools were opened and eight (8) elementary schools were closed. During this period, there were fourteen (14) racially identifiable schools which had black populations of 40% or more. (PX1 at 8). Plaintiffs emphasize that, despite the opening and closing of several elementary schools over the years, none of the fourteen (14) racially identifiable schools were further desegregated by Defendants' decisions. Plaintiffs argue that, Defendants have not merely lost desegregation opportunities, but have actively promoted segregation in the community.

Conversely, Defendants assert that they have taken care to ensure that their actions in site selection and school construction do not cause a return to a dual system. Defendants emphasize that the School Board has not built any new schools since 1971 which entailed an all-white or majority black enrollment. Moreover, Defendants maintain that, despite the fact that most of the new construction has taken place in the suburbs, the School Board has also expended a substantial portion of its capital funds on construction and remodeling projects for inner city schools, some of which have opened as magnet schools to foster desegregation.

There is no question that the location of new schools has an immense impact on the community as a whole. The Supreme Court has repeatedly articulated the import of such decisions.

> The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

Swann, 402 U.S. at 20–21, 91 S.Ct. 1267.

As discussed above, Defendants have failed to aggressively combat segregation. Unfortunately, Defendants' shortcomings with regards to student assignments may have contributed to the fact that more schools are needed in the predominately white suburbs. Undoubtedly, it is impossible to determine the precise effects of the School Boards' decisions over the past twenty-seven (27) years on the residential patterns in Hillsborough County. However, Defendants' lack of good faith commitment over the years, in conjunction with Defendants' decisions to build the majority of new schools in the areas of white suburban expansion farthest from the areas with concentrated black populations, causes this Court concern. Moreover, Defendants' position that they were not required to take affirmative action, once the initial system of

nondiscriminatory attendance patterns was implemented, undermines their contentions that they have not contributed to the racial identifiability of Hillsborough County schools.

Nevertheless, the Court finds that Defendants' evidence demonstrates that the opening and closing of schools has generally maintained or improved racial balance. *See* (DX 3 and DX 4). While the Court expects additional documentation to be provided on this subject when unitary status is considered in the future, the Court is not inclined to become further entangled in the complex educational policies involved in new school construction and school abandonment decisions.[50] Instead, the Court will afford Defendants the opportunity to demonstrate that state-imposed segregation no longer exists.

 In addition, the parties addressed the issues concerning overcrowding. Plaintiffs argue that, not only has the School Board selected sites in predominately, if not exclusively, white neighborhoods, but there is evidence that schools which are twenty (20) percentage points above the district-wide black population are more likely to be overcrowded than any other Hillsborough County schools. However, as noted above, Plaintiffs' evidence regarding FISH capacities does not include portable classrooms; therefore, schools that exceed their FISH capacities are not necessarily overcrowded. Notwithstanding, the use of portable classrooms is relevant to the inquiry of the equality of school facilities. While a school may not be "overcrowded" because of the extensive use of portable classrooms, the fact that brand new schools are being built elsewhere should be evaluated. Defendants shall make this evaluation and demonstrate that new school construction decisions have taken into consideration the discrepancies between the use of portable classrooms at racially balanced and unbalanced schools.

**G.** *Quality of Education*

With regard to quality of education, Plaintiffs argue that socioeconomic factors do not adequately explain the disparity in academic achievement levels among black and white students. Plaintiffs argue that Defendants' evidence is insufficient and the differences in achievement levels demonstrate vestiges of the prior *de jure* segregated schools system.

Significantly, the Court's orders contain no specified levels of student achievement, nor any standard to evaluate quality of education. To a large extent, the quality of education being provided in Hillsborough County must be scrutinized in connection with the other factors which the Court has previously reviewed, particularly in connection with the facilities provided and the allocation of resources. In addition, however, the parties have generally agreed on several areas of the Defendants' operations which should be addressed in regards to judging the equality of educational opportunity being afforded to students. These include dropout rates, suspension rates, gifted child education programs, and academic outcome.

As discussed above, Defendants need to evaluate certain facets of the school system with regards to the equality of facilities. Moreover, Defendants shall provide Plaintiffs with the documentation necessary so that productive discussions and negotiations between the parties can ensue. With regards to resource allocations, there is no indication that the Defendants have violated the Fourteenth Amendment and this area merely needs to be monitored by Defendants as they continue to implement the desegregation plan, as well as, the Middle School Plan. No further discussion is required on these issues.

**(i)** *Dropout Rates*

Both Dr. Armor and Dr. Stevens addressed dropout rates at the evidentiary hearing. Although Plaintiffs did not present

---

**50.** The Court expects Defendants to provide Plaintiffs with sufficient information so that the decisions made by the School Board, with regard to construction and abandonment of schools, can be adequately evaluated. Plaintiffs have already articulated the documentation which they believe is necessary. However, since the parties will be working very closely to insure that a unitary school system is forthcoming, the Court finds it unnecessary, at this point, to define the parameters of the communication between the parties on this topic.

any independent evidence on the subject, they take issue with analyses conducted by Dr. Armor relating to academic outcomes, but not to the use of that factor. Dr. Stevens notes that black students drop out of school at rates disproportionate to their presence in the general student population. (PX 1 at 31–32). Similar to the issues concerning suspensions, Dr. Stevens does not allege a discriminatory basis for this result, but calls for increased monitoring, and, a different method of record keeping. *Id.* at 32.

Significantly, Defendants monitor dropout rates, and they maintain a program designed to reduce the number of dropouts, without regard to race. That program is multifaceted, including several components. One is the Personalized Education Program ("PEP"), which is based in the elementary schools, and focuses on academic interventions in the areas of reading, math, and skills development. (T7 at 206–07). In middle and junior high schools, Defendants endeavor to predict which students are at risk of dropping out and again focus on academic skills by using teachers with lower pupil to teacher ratios. (T7 at 207). Additional counselors and teachers are provided at senior high schools. *Id.* Moreover, prospective dropouts are assigned either on a voluntary basis or by administrative action to alternative schools. *Id.* As with suspensions, the defendants monitor dropouts and report them monthly to principals, with the expectation that they will follow up as part of a "dropout retrieval program." *Id.* As a result of these efforts, Defendants' dropout rates are the lowest in the state for districts of its size. (T7 at 208–09).

Dr. Armor presented an analysis of the differences in dropout rates between black and white students. Under this analysis, and after controlling for the socioeconomic status ("SES") factors of free lunch eligibility and family structure, virtually all of the gap between black and white statistics is explained. (DX 1 at 24 and Chart 54). Even if adult education students are included within the dropout statistics, nearly three-fourths of the difference is explained, and the predicted difference between black and white rates is 3%. *Id.* Plaintiffs' objections to the Magistrate Judge's findings are overruled.

(ii) *Suspensions*

With regards to student suspensions, Dr. Stevens notes that black students are suspended from school for disciplinary purposes at a rate which is disproportionate to their presence in the school population. Dr. Stevens also notes that the rate of suspension was two (2) to four (4) times as high for black students as for whites from 1991 to 1994. However Plaintiffs do not cite these statistics as necessitating a conclusion that racial discrimination has occurred. Indeed, Dr. Stevens testified that they are not unusual. (T4 at 145). Nevertheless, he expressed concern over the obvious fact that a suspension deprives the disciplined student of the educational opportunities which are provided during the term of the suspension. (T4 at 145–46). Additionally, Dr. Stevens suggested that the data demonstrates the need for further analysis by Defendants to ensure that they do not result from discriminatory treatment. (PX 1 at 29–30).

Defendants have been monitoring the suspension rates in Hillsborough County. In fact, the data relied upon by Dr. Stevens was collected by Defendants, who track suspensions and expulsions, by sex, race, and age. (T7 at 234). The suspension rates in Hillsborough County are slightly below State of Florida averages "for some groups." *Id.* Significantly, there is no evidence to suggest that the disproportionate suspension rates are the result of discrimination by Defendants. Consequently, Plaintiffs' objections in this regard are overruled.

(iii) *Gifted Program*

In addition, both parties agree that gifted child education should be reviewed as well. As discussed below, Defendants implemented a program ("Plan B") in 1993 to facilitate admission of disadvantaged students to the gifted programs. *See* (T2 at 151). The standard for admission to gifted programs offered by the Defendants is a tested IQ of at least 130. This requirement is set by the State of Florida for that part of the program and is referred to as "Plan A." (T2 at 153). Previously, Defendants could not deviate from this prerequisite. (T2 at 155–56). However, in 1991, the State allowed school

districts to formulate plans for "Plan B," which was designed to facilitate admission of disadvantaged students to the gifted programs. (T2–151). Participation in Plan B is voluntary. (T2–153). Defendants elected to participate in Plan B as soon as it was allowed, completing their plan and obtaining state approval in 1993. (T2–151). Plan B allows students with an IQ of 115, demonstrated academic achievement, and certain personal characteristics to be admitted to the same program in which those with the higher IQ are enrolled. (T2 at 154). Nevertheless, prior to Plan B, the State standard for gifted class admissions was applied without regard to the race of the student. (T2 at 156–57).

As of October 1996, gifted programs in Hillsborough County included 8,219 white students (74.5%), 1,015 black students (9.2%), 1,249 Hispanic students (11.3%), 481 Asian students (4.0%), 71 Indian students (less than 1%), and 27 multi cultural students (less than 1%). (T2 at 151–52). Dr. Stevens notes that while black enrollment district-wide is 23%, black students constitute only 9% of those children enrolled in the Defendants' gifted education programs. (PX1 at 30). Moreover, Dr. Stevens reported that 9.2% of all white children have been assessed as gifted, whereas, only 2.9% of the black students in the county have been so classified. (PX 1 at 30). Dr. Stevens emphasized that white students are three (3) times more likely than black students to be identified as gifted. *Id.* Significantly, Dr. Stevens admitted that these figures do not evidence racial discrimination, however, he does suggest increased scrutiny. The Court agrees that there is no indication that student placement is connected to race, and, consequently, Plaintiffs' objections to the Magistrate Judge's findings with regards to the School Board's gifted programs are overruled.

(iv) *Academic Outcome*

Dr. Armor examined several factors relating to academic outcomes, including achievement test scores, outcomes for seniors, and school effects. Data relating to Hillsborough County students demonstrates that there are differences between the achievement test scores of black students and their white counterparts. However, these results are not unique to Defendants' school system.

Nationally, achievement gaps between students of the two (2) races range from two-thirds to four-fifths of a standard deviation, depending on the test in question and the grade level of the students taking it. (DX 1 at 21).

The results of tests administered to fifth grade students in Hillsborough County in 1994 and 1995 produced a gap of 16 to 17 points between black and white students. This difference represents approximately three-fourths of a standard deviation, which is consistent with the national statistics cited by Dr. Armor. (DX 1 at 22). In addition, Dr. Armor analyzed the data just-described, and controlled for certain SES factors. The particular factors which Dr. Armor used were poverty level (using free lunch eligibility), number of parents in the household, average income, and parent education level. When he performed this analysis on the fifth grade students who took the tests in 1995, controlling for the identified SES measures, 60% of the gap between the races was explained. (DX 1 at 23 and Chart 46). Dr. Armor also controlled for SES factors while adding the test takers' first grade reading test results as a proxy for the level of preparedness of students upon beginning their schooling. He was able to explain some 90% of the gap between the scores of whites and blacks using this analysis. (DX 1 at Chart 47).

Using the same methods for the 1994 school year, Dr. Armor obtained similar results. (DX 1 at Charts 48 and 49). In Dr. Armor's opinion, these findings show that race does not predict lower achievement test results for black Hillsborough County students. However, Plaintiffs' expert, Dr. Robert Crain, took exception with Dr. Armor's analysis. Nevertheless, when Dr. Crain used the same control factors as Dr. Armor, his results were substantially similar. (T6 at 265–66).

Dr. Crain questioned Dr. Armor's use of first grade reading scores, and the source of other factors Armor used. In his initial report, Dr. Crain questioned Defendants' use of first grade reading scores on the basis of their "notorious" unreliability. (PX 3 at 1). At the hearing, however, Dr. Crain did not

rely on this criticism, focusing instead on the impropriety of these scores as a control because they do not demonstrate initial skills prior to schooling. (T6 at 162–63). Notwithstanding, Dr. Crain conceded that a child's characteristics at the beginning of his or her education do affect performance. (T6 at 243–44). Dr. Crain performed an analysis using only the variables of free lunch and two (2) parents. (T6 at 266). This study produced a predictive line of regression which is parallel to that of Dr. Armor's study, indicating a similar effect. Although Dr. Crain conducted this analysis, he did not produce these results for the Court. *Id.* Neither did he test the statistical significance of any differences between his analysis and that of Dr. Armor. (T6 at 270).

Although Dr. Crain's concerns are understandable, he has not provided a rational basis for rejecting Dr. Armor's analysis. The use of neighborhood data could be replaced only through individual surveys of each family. While the factors used by Dr. Armor might themselves be affected by race, Dr. Crain does not explain how this possibility is any more impairing when using income, the use of which Dr. Crain criticizes, than for poverty, the use which he does not criticize.

Dr. Crain also objected to Dr. Armor's use of a single model, combining black and white students, believing that separate models were more appropriate. (T6 at 176–77). Dr. Armor testified that earlier studies used two models based on differences in the educational outcomes of the two (2) races, but more recent studies have not disclosed such a difference and therefore rely on single models. (T7 at 182–84). Significantly, Dr. Crain's two (2) models did not produce different results.

Dr. Armor also examined reading achievement of black students based on the racial makeup of their schools. (DX 1 at 26 and Chart 56). Dr. Armor found that a gap between these students and their white counterparts existed, even when the black children attended schools which were less than 40% black. Dr. Armor's analysis also found that black students who attended such schools scored two (2) points lower than black students at schools with over 40% black populations. However, when the analysis controlled for SES variables, the gap disappeared. *Id.*

Dr. Crain criticized these portions of Dr. Armor's findings as well, but this was based on his use of a different type of statistical analysis, described as a "one-tailed test." Ordinarily, a "two-tailed test" is used to analyze a sample of data. The tails refer to the two halves of a bell curve which predict the outcomes of the test. A one-tailed test eliminates all outcomes which fall in one half of that curve. Dr. Crain admitted that the use of the one-tail model is allowable only when the tester has an independent basis for predicting outcomes. (T6 at 273).

In this case, Dr. Crain justified the use of that model by stating that "no one in his right mind" would expect a black child to perform better academically in a school which is more than 40% black. (T6 at 274). Significantly, Dr. Crain did not provide any basis for this belief; therefore, there is no basis for using the one-tailed analysis. Dr. Armor testified to studies showing that blacks can, in fact, perform better academically in an all-black school when compared with their integrated counterparts. (T7 at 161–62). Indeed, within the "tail" which Dr. Crain eliminated from his analysis, were examples of black children who outperformed their counterparts in schools with lower black populations. Robles, which has the highest percentage of black students, falls exactly where statistically predicted. (T7 at 165). Interestingly, Dr. Crain testified that, even using the one-tail model, he found no difference between student achievement on math tests by fifth graders who attended schools that were more than 40% black. (T6 at 281–82). Clearly, Plaintiffs' argument that there is a possibility of race-based differences between the quality of education Defendants provide to black students in reading, but not in math, is illogical.

Defendants have tracked the educational achievement of its students, by race, on several occasions over the last nineteen (19) years, and continue to do so. (T2 at 147). Black students in Hillsborough County outperform black counterparts nationally and in the State of Florida on Scholastic Assessment Tests taken by 47% of all seniors. (T2

at 141). Black students in the county also outperform other black students in the State on the standardized test required for graduation. *Id.* Additionally, Defendants have performed their own analysis of the impact of attendance at the over 40% black schools upon black achievement. After controlling for SES variables, no impact was found, which result was consistent with Dr. Armor's analysis. (T2 at 143).

■ The Court finds that the educational programs in Hillsborough County are provided on a fair and equal basis to students of all races. Although some differences in academic performance exist between black and white students depending on their race, these differences are the result of socioeconomic factors unrelated to the schools. While this discrepancy is unfortunate, it is not the result of segregation nor evidence of vestiges of a prior *de jure* system. In *Swann,* the Supreme Court articulated the limitations of the courts' remedies.

> We are concerned in these cases with the elimination of discrimination inherent in the dual school systems, not the myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the [desegregation cases] was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage.

*Swann,* 402 U.S. at 22–23, 91 S.Ct. 1267. Plaintiffs' objections with regards to the quality of education provided by Defendants are overruled.

*III. Conclusion*

"[T]he court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman,* 503 U.S. at 489, 112 S.Ct. 1430. The Court does not wish to supervise the School Board any longer; however, supervision remains necessary. The Court believes that this case is nearing its completion, but there is more work to be done. Nevertheless, the Court

anticipates that "unitary status" will be achieved over the next few years.

Contrary to the parties' submissions, they are not as divided and polarized as it appears. Unfortunately, the inherent nature of the adversarial process encourages litigants to emphasize and accentuate their differences. Notwithstanding, the parties should be able to work together to achieve unitary status within a few years. Significantly, the 2000 census will soon be available to the parties which will provide updated data which will add to the understanding of the circumstances in Hillsborough County, specifically with regards to the Middle School Plan being implemented.

Unitary status is not a concrete concept and involves management of innumerable issues. It is not always black and white. One non-quantitative factor of particular significance is whether the School Board has sufficiently demonstrated good faith compliance with regards to both the operation of the educational system in general and the implementation of the Court's desegregation orders. At this point, Defendants have failed to show that further oversight is no longer necessary to avoid an imminent return to the unconstitutional conditions that led to the Court's intervention.

As discussed above, the Court finds that Defendants have failed to demonstrate a good faith commitment to the Court's desegregation orders. Unfortunately, this lack of good faith taints the analysis of the other facets of the school district's operations. Because some of the schools in the system are racially identifiable, there is a presumption that the racial identifiability is traceable to the prior *de jure* system. Because Defendants have not fully embraced their affirmative duty, Defendants have not desegregated the school district to the maximum extent practicable. The relevance of good faith is that it conveys the notion that unitariness is less of a quantifiable moment in the history of a desegregation plan than it is the general state of successful desegregation. With each instance of a failure or refusal to fulfill their affirmative duty, Defendants have continued to violate the Fourteenth Amendment. As a

result, the Court is compelled to retain jurisdiction.

It is very difficult in a case such as this to categorize different aspects of the school system and declare individual areas unitary. Especially because the Court is convinced that Defendants' failure to demonstrate a good faith commitment has continued the constitutional violation and has diminished the availability of effective remedies. Clearly, Defendants need to address the issue of student assignments. Because of the passage of time and the construction and abandonment of schools, there are limitations on what can be accomplished. Nevertheless, Defendants have various desegregative techniques available and have the benefit of evaluating the techniques employed in other school districts. The School Board should not have to be told what to do at every turn; Defendants must be willing to take the reins. The School Board should initiate affirmative desegregation policies and practices to demonstrate that supervision by the Court can cease. By working with Plaintiffs to achieve unitary status, the parties can avoid unnecessary polarization and accomplish the task at hand relatively quickly.

After evaluating the voluminous record in this case, the Court is convinced that Defendants have a short road to travel. Essentially, Defendants need to demonstrate that they are willing to aggressively desegregate the school district to the maximum extent practicable. Defendants should evaluate desegregation tools that have been successful in other districts and determine whether they can be effectively employed in this school district. Secondly, Defendants need to provide Plaintiffs with the necessary documentation so that Plaintiffs can conduct independent analysis and provide input with regards to desegregating the district. While Defendants are not bound to implement any policies or procedures that Plaintiffs may recommend, the insight into Plaintiffs' perspectives will prove to be invaluable. Moreover, Defendants should document and chronologize the affirmative steps taken from the date of this Order.

The school district has changed a great deal since this suit was filed. Hillsborough County enjoys a diverse population which includes people of every race and national origin. The concept of unitary status should likewise account for the change in Hillsborough County's change in demography. Neither the county nor the concept of unitariness can be confined to black and white issues. It is questionable whether the 80/20 ratio remains as an appropriate a starting point. For instance, in 1990, approximately 14% of the school-aged population was considered to be of Spanish descent. (DX 2 table 1). Moreover, approximately 5% were classified as "other." *Id.* However, the parties failed to address these significant variables. Defendants bear the burden of proof. Accordingly, it is .

**ORDERED** that the Magistrate Judge's Report and Recommendation (Docket No. 809) be **adopted in part and rejected in part; Defendants have failed to prove that the racial imbalances in the school system are not traceable, in a proximate way, to vestiges of past discrimination; Defendants have failed to demonstrate a good faith commitment to this Court's desegregation orders; the Hillsborough County public school system is not unitary; Defendants remain subject to the Court's 1971 desegregation Order and the 1991 Consent Order; Defendants shall discharge their duties consistent with this Order; Plaintiffs' Motion to Enforce (Docket No. 753) is DENIED as moot; and jurisdiction is retained.**